*61 BALMER, C. J.
In this criminal case, we again consider when evidence discovered following a person’s voluntary consent to search must be suppressed on the theory that the police exploited a prior illegality to obtain the consent. Last year, we addressed that issue in State v. Hemenway, 353 Or 129, 295 P3d 617 (2013), and modified part of this court’s exploitation analysis previously described in State v. Hall, 339 Or 7, 34-35, 115 P3d 908 (2005). Shortly after issuing Hemenway, this court learned that the defendant in that case had died before the court had issued its opinion. Accordingly, we vacated our decision as moot. State v. Hemenway, 353 Or 498, 506, 302 P3d 413 (2013). In this case, as in Hemenway, the state asks this court to revisit the exploitation analysis in Hall and either overrule it or modify it as the court did in Hemenway. Defendant, on the other hand, asks this court to reaffirm Hall.
The state charged defendant with manufacture of cocaine and endangering the welfare of a minor, among other things. Before trial, defendant moved to suppress physical evidence and statements obtained by detectives after they knocked on the back door of defendant’s house and obtained defendant’s consent to enter and then to search the house. Defendant argued both that his consent had not been voluntary and that the detectives had exploited their unlawful conduct to obtain his consent in violation of Article I, section 9, of the Oregon Constitution.[1] The trial court denied the motion, and a jury convicted defendant on four of the counts charged. The Court of Appeals reversed, reasoning that, under the Hall exploitation analysis, the detectives’ unlawful entry into defendant’s backyard to reach his back door had “tainted [defendant’s] subsequent consent.” State v. Unger, 252 Or App 478, 487-88, 287 P3d 1196 (2012). For the reasons that follow, we reverse the decision of the Court *62 of Appeals. In doing so, we modify part of the exploitation analysis announced in Hall.
I. FACTS AND PROCEEDINGS BELOW
The Marion County Sheriffs Office received a complaint about drug activity at defendant’s house, and an informant had reported that young children were staying there and had access to drugs and guns. In response, three detectives from the sheriffs office and one detective from the Canby Police Department went to the house around 10:00 a.m. to conduct a “knock-and-talk.” One detective knocked on the front door, but received no response. Another detective then knocked on a basement door on the lower level of the front of the house, but he also received no response. Despite the lack of responses, several cars were in the driveway, and the detectives thought that someone likely was home.
One detective, Roberts, eventually followed a path around the lower level of the house, which led up to a wraparound porch in back, where there was a sliding glass door that was partially covered with drapes. Roberts knocked on the sliding glass door, and, when defendant came to the door, it appeared that defendant had just woken up. Roberts introduced himself as “Kevin [Roberts] with the sheriff’s office,” and he explained that there had been a complaint about the house. Defendant asked to put on a robe and then gave the detectives permission to enter the house. At some point during the initial interaction between defendant and Roberts, at least two of the other detectives joined Roberts at the sliding glass door.[2]
The sliding glass door opened into a bedroom, and defendant led the detectives through the bedroom, where a woman was in bed, to the kitchen. In the kitchen, the detectives introduced themselves and again explained why they were there. The detectives then asked if defendant would show them around the house, and defendant agreed.
*63 Defendant took the detectives on a tour of the house, and throughout that tour, defendant was “cooperative.” When defendant showed the detectives the lower level of the house, Roberts noticed a torn piece of a bag that was coated with a white powder and contained some small crystals. Roberts told Detective Cypert what he had found, and Cypert passed that information along to defendant. Cypert then read defendant a “consent to search” card, which included a warning that defendant did not have to consent, but defendant refused to sign the card without first consulting his attorney. Cypert testified that defendant had given the detectives “verbal consent to continue to look through the house,” and defendant called his attorney. Meanwhile, one of the detectives performed a field test on the torn piece of bag.
After defendant spoke to his attorney, he told the detectives that his attorney wanted the detectives to leave the house. According to Cypert, Cypert told defendant that “it was ultimately up to [defendant] to make that decision if he wanted [the detectives] out of the house,” and defendant said he wanted to speak to his attorney again. After speaking to his attorney a second time, defendant told the detectives that he wanted everybody out of the house. By that point, however, the bag that Roberts had found had tested positive for methamphetamine, and the detectives placed defendant under arrest. The detectives obtained a search warrant based on the evidence found during their initial interactions with defendant, and they discovered additional incriminating evidence when executing the warrant.
Before trial, defendant moved to suppress all evidence and statements obtained as a result of the detectives’ “unlawful entry into the home and subsequent search, seizure, interrogation and arrest.” Defendant argued both that his consent had not been voluntary and that the detectives had exploited their unlawful entry into his backyard to obtain his consent in violation of Article I, section 9, of the Oregon Constitution.[3] The trial court denied the motion, *64 finding that defendant had “allowed [the detectives] consensual entry into the house” and that “the consent [had been] freely and voluntarily made.” The trial court did not expressly address whether the detectives’ position in the backyard at the sliding glass door had been unlawful, and, if so, whether the detectives had exploited that illegality to obtain defendant’s consent. In a subsequent jury trial, defendant was convicted on four of the counts charged. Defendant appealed the trial court’s denial of his motion to suppress.
The Court of Appeals reversed and remanded. The court first determined that the detectives had trespassed in violation of Article I, section 9, when they entered defendant’s backyard and knocked on his back door. Unger, 252 Or App at 483. Because, on appeal, defendant did not argue that his consent had been involuntarily given, the court went on to apply the exploitation analysis set forth in Hall to determine “whether the [detectives’] illegal entry into defendant’s backyard invalidated defendant’s consent to the [detectives’] entry into and search of his home.”[4] Id. at 483-84.
In Hall, this court described a two-step analysis to determine whether evidence obtained pursuant to voluntary consent must nonetheless be suppressed. Under Hall, a defendant must establish a “minimal factual nexus” between the evidence that the defendant seeks to suppress and the prior unlawful police conduct. If the defendant makes that showing, then the state must show that (1) the police inevitably would have obtained the evidence through lawful procedures; (2) the police obtained the evidence independently of the illegal conduct; or, as relevant here, (3) the illegal conduct was “independent of, or only tenuously related to” the disputed evidence. Hall, 339 Or at 25, 35. In determining whether the illegal police conduct was “independent of, or only tenuously related to,” the disputed evidence, Hall noted that “[a] causal connection requiring suppression may exist because the police sought the defendant’s consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct.” Id. at 35. The court went on to state that a causal connection requiring suppression also *65 may exist if the illegality “significantly affected” the defendant’s decision to consent. Id. Hall identified several considerations relevant to “determining the existence of such a causal connection”:
“(1) the temporal proximity between the unlawful police conduct and the defendant’s consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances — such as, for example, a police officer informing the defendant of the right to refuse consent— that mitigated the effect of the unlawful police conduct.”

Id.

In this case, the Court of Appeals determined that defendant had established a minimal factual nexus because “[t]he trespass gave the [detectives] the opportunity to obtain defendant’s consent” and “the trespass was ongoing when the [detectives] obtained defendant’s consent to enter his house.” Unger, 252 Or App at 486. The court went on to note that “[t]he state [did] not argue that defendant’s consent was independent of or only tenuously related to the [detectives’] trespass” and rejected the state’s argument that no exploitation had occurred because the detectives had not sought consent based on anything that they saw during the trespass.[5] Id. at 486-87. Thus, the court concluded that the detectives’ illegal entry into defendant’s backyard had tainted his consent, and the court reversed and remanded.
The state petitioned for review. On review, the state argues that this court should overrule Hall by eliminating the exploitation analysis and instead holding that evidence obtained during a voluntary consent search necessarily is admissible despite prior unlawful police conduct. Alternatively, the state argues that this court should adhere to two modifications to Hall that were announced in Hemenway: According to the state, Hemenway clarified that Hall had undervalued the constitutional significance *66 of voluntary consent and overvalued the constitutional significance of the temporal proximity between the police illegality and the defendant’s consent. See Hemenway, 353 Or at 144 (“We agree that the exploitation test announced in Hall does not account sufficiently for the importance of a defendant’s voluntary consent to search.”); id. at 150 (“[T]he focus on ‘temporal proximity’ too easily leads to the conclusion that any consent search that occurs when a person is unlawfully stopped is invalid, when the better-framed question is whether police exploited the unlawful stop to obtain the consent.” (Emphasis in original.)). In this case, the state argues that Article I, section 9, does not require that the evidence be suppressed because defendant voluntarily had consented to the detectives’ entry into and search of his house. Alternatively, the state argues that suppression is not required because there is no indication that any illegality significantly affected defendant’s decision to voluntarily consent, particularly because the illegality was of short duration and the detectives’ conduct was not aggressive or intimidating.
Defendant responds that this court should retain the exploitation analysis set forth in Hall because voluntary consent alone is insufficient to overcome police illegality that preceded a defendant’s decision to consent. Moreover, defendant asserts that this court in Hall tailored the exploitation analysis to the rationale that underlies Oregon’s exclusionary rule: the vindication of an individual’s right to be free from unreasonable searches and seizures. According to defendant, accounting for the nature of the detectives’ misconduct — brief and not aggressive or intimidating — in the exploitation analysis, as the state proposes, would be inconsistent with that rationale. Here, applying the Hall analysis, defendant argues that Article I, section 9, requires that the evidence be suppressed because, although defendant’s consent was voluntary, the detectives exploited their illegal entry into defendant’s backyard to place themselves in a position to contact defendant and request his consent. Defendant also notes that no intervening or other circumstances mitigated the effect of the unlawful police conduct. Thus, defendant argues, this court should affirm the Court of Appeals.
*67 II. THE HALL EXPLOITATION ANALYSIS
We begin with a summary of the relevant parts of Hall. In that case, the defendant voluntarily consented to a search after being stopped by police, and the police discovered drugs. The defendant moved to suppress, arguing that the stop had been illegal and that that illegality required suppression of the evidence despite his voluntary consent to the search. The trial court denied the motion, but the Court of Appeals reversed and ordered the evidence suppressed. 339 Or at 10-12. The state petitioned for review, arguing, among other things, that the defendant’s voluntary consent had severed the causal link between the illegal police conduct and the evidence. Thus, in the state’s view, the exclusionary rule did not bar the evidence, because the illegal conduct did not bring the evidence to light. Id. at 14. On review, a majority of this court first examined the nature of the police interaction with the defendant, concluding that the officer unlawfully had stopped the defendant in violation of Article I, section 9. Id. at 19. As discussed below, the majority then addressed the proper framework for determining whether the evidence gleaned from the consent search nevertheless had to be suppressed because of the illegal stop.
The majority in Hall began by outlining the history of the exclusionary rule in Oregon and analyzing this court’s past treatment of consent searches. The exclusionary rule is constitutionally mandated and serves to vindicate a defendant’s personal right to be free from unreasonable searches and seizures. Id. at 24. The federal exclusionary rule, by contrast, is premised on deterring police misconduct. Id. at 23. The goal of the exclusionary rule in Oregon is to “restore a defendant to the same position as if‘the government’s officers had stayed within the law’” by suppressing evidence obtained in violation of the defendant’s rights. Id. at 24 (quoting State v. Davis, 295 Or 227, 234, 666 P2d 802 (1983)).
The majority noted that illegal police conduct may negate a defendant’s consent to search and require suppression of evidence in two ways. First, the consent itself may be “involuntary” if the illegal police conduct overcame the defendant’s free will and the consent instead resulted from *68 “police coercion.” Id. at 20. Second, evidence gained through a voluntary consent search still may require suppression if the defendant’s consent to search “derived from” the prior illegal police conduct. Id. at 21. The majority rejected the state’s argument that only the voluntariness inquiry was necessary, stating that, even when a defendant voluntarily consents,
“this court’s case law * * * makes clear that Article I, section 9, also requires the consideration of the effect of the unlawful police conduct upon the defendant’s decision to consent, even if that conduct did not rise to the level of overcoming the defendant’s free will.”
Id. at 32. In particular, the majority relied on State v. Rodriguez, 317 Or 27, 854 P2d 399 (1993), and State v. Kennedy, 290 Or 493, 624 P2d 99 (1981), noting that those cases had borrowed from the exploitation analysis that the United States Supreme Court had announced in Wong Sun v. United States, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963), to analyze whether Article I, section 9, required suppression of evidence obtained through voluntary consent searches.[6] Although neither Rodriguez nor Kennedy required suppression on the facts of those cases, the majority in Hall noted that both cases had analyzed the issue as whether the defendant’s voluntary consent “derived from” the prior illegal seizures. 339 Or at 30-32. The majority determined that “consent is insufficient to establish the admissibility of evidence from a warrantless search if the state cannot prove that the consent was independent of, or only tenuously related to, any preceding violation of the defendant’s rights under Article I, section 9.” Id. at 27 (citing Rodriguez, 317 Or at 41-42).
The majority in Hall summarized its conclusions as follows:
“After a defendant shows a minimal factual nexus between unlawful police conduct and the defendant’s consent, then *69 the state has the burden to prove that the defendant’s consent was independent of, or only tenuously related to, the unlawful police conduct. Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant’s consent. A causal connection requiring suppression may exist because the police sought the defendant’s consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant’s free will, significantly affected the defendant’s decision to consent. Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant’s consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances — such as, for example, a police officer informing the defendant of the right to refuse consent— that mitigated the effect of the unlawful police conduct.”
Id. at 34-35.
Justice Durham filed a separate opinion, joined by Justice Gillette, concurring in part and dissenting in part. The dissent agreed that the defendant had been illegally stopped, but disagreed that that prior illegality should result in the suppression of the evidence gained through the consent search. The dissent asserted that the defendant’s “voluntary consent to the search demonstrate [d] that the disputed evidence came to light as the result of a reasonable, not unreasonable, search.” Id. at 39 (Durham, J., concurring in part and dissenting in part). The dissent took issue with the majority’s reliance on Rodriguez, which the dissent characterized as incorrectly focusing on the police decision to seek consent, “rather than the voluntariness of the defendant’s consent.” Id. at 50. In the dissent’s view, the inquiry into the voluntariness of a defendant’s consent takes into account any prior illegal conduct by the police. Id. at 46. And, a voluntary consent to search fully vindicates the defendant’s rights under Article I, section 9, because the *70 evidence was gained as a result of that consent and not by way of the prior illegality. Id. at 51.
III. CLARIFICATION AND MODIFICATION OF HALL
As it did in Hemenway, the state argues that we should overrule our 2005 decision in Hall and instead hold that evidence found during a voluntary consent search necessarily is admissible under Article I, section 9, despite any prior police illegality. “ [T]he principle of stare decisis means that the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent.” State v. Ciancanelli, 339 Or 282, 290, 121 P3d 613 (2005). The state thus has the burden of demonstrating that we should reconsider and reject the rule announced in Hall. Similarly to the state’s arguments in Hemenway, the state argues, among other things, that Hall failed to apply this court’s “usual paradigm” for analyzing constitutional provisions; that the decision failed to construe the text or discuss the history of Article I, section 9; and that it departed from earlier case law. We have considered — and we reject — the state’s argument that Hall suffers from the deficiencies that the state asserts. We also note that, in seeking to overrule Hall, the state relies in substantial part on arguments that were, in fact, raised by the Hall dissent and considered and rejected by the majority.
Although we reject the state’s assertion that Hall articulated an impermissible construction of Article I, section 9, we agree that Hall’s test for exploitation is flawed in some respects and bears refinement. As it did in Hemenway, the state argues that internal contradictions mar both steps of Hall’s exploitation test and make the test difficult in application and uncertain in result. The state is correct that, in practice, the Hall test has caused some confusion. Parties and the courts have struggled to determine when a defendant has met his or her burden of establishing a “minimal factual nexus” and whether the police exploited their illegal conduct to obtain a defendant’s consent to search. We turn to those issues.
We begin with a review of the relevant legal principles. In the context of Hall and in this case, the inquiry into whether evidence obtained pursuant to a consent search *71 must be suppressed involves three overlapping issues: (1) whether the initial stop or search was lawful; (2) whether the defendant’s consent to the subsequent search was voluntary; and (3) assuming that the initial stop or search was unlawful and the consent to the subsequent search was voluntary, whether the police exploited the illegality to obtain the disputed evidence.
The first issue is the lawfulness of the police-citizen encounter. If the defendant argues that the initial encounter was an unlawful seizure, then the court must examine the nature of that encounter. See Hall, 339 Or at 19 (examining nature of encounter between police officer and the defendant before engaging in exploitation analysis). There is nothing constitutionally suspect under Article I, section 9, about police engaging a citizen in conversation and then requesting that citizen’s consent to search. State v. Ashbaugh, 349 Or 297, 308-09, 317, 244 P3d 360 (2010). In contrast to “mere conversation,” which does not implicate Article I, section 9, an officer “stops” an individual — raising potential constitutional issues — when the officer “intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual’s liberty or freedom of movement.” Id. at 308, 316; see also State v. Backstrand, 354 Or 392, 399-402, 412-13, 313 P3d 1084 (2013) (outlining principles that guide analysis of what constitutes a seizure for purposes of Article I, section 9). Article I, section 9, requires the police, before stopping an individual, to have reasonable suspicion that the individual is involved in criminal activity. In the absence of reasonable suspicion (or some other permissible concern, such as officer safety), the individual has the right to be free from police interference and may terminate an encounter with police at will. See Ashbaugh, 349 Or at 308-09.
Alternatively, the initial encounter may take the form of a search. A search occurs when “the government invades a protected privacy interest,” State v. Meredith, 337 Or 299, 303, 96 P3d 342 (2004), and a protected privacy interest may be tied to a particular space. See State v. Smith, 327 Or 366, 373, 963 P2d 642 (1998) (“[T]he privacy interests that are protected by Article I, section 9, commonly are circumscribed by the space in which they exist and, more *72 particularly, by the barriers to public entry (physical and sensory) that define that private space.”). A search is “per se unreasonable,” in violation of Article I, section 9, in the absence of a warrant or an exception to the warrant requirement. State v. Baker, 350 Or 641, 647, 260 P3d 476 (2011).
The second issue is whether the consent to search was voluntary. The proper test for voluntariness of consent “is to examine the totality of the facts and circumstances to see whether the consent was given by defendant’s free will or was the result of coercion, express or implied.” Kennedy, 290 Or at 502 (citing Schneckloth v. Bustamonte, 412 US 218, 226-27, 93 S Ct 2041, 36 L Ed 2d 854 (1973)). To prove the voluntariness of a consent to search in the context of an illegal stop or an illegal search, the state must prove that the defendant’s consent was the product of his or her own free will, rather than the result of coercion. State v. Wolfe, 295 Or 567, 572, 669 P2d 320 (1983); see also State v. Stevens, 311 Or 119, 136, 806 P2d 92 (1991) (consent to search voluntary when no evidence that “the police intimidated or coerced defendant in any way”); Kennedy, 290 Or at 504, 506 (consent to search voluntary in light of “an almost total absence of coercive factors”).
The specific focus of Hall and of this case is the third part of the inquiry: If the police-citizen encounter was unlawful, but the consent to search was voluntary, the issue becomes whether the police exploited their illegal conduct to obtain the consent to search and, by that means, the evidence in question. In Wong Sun, the United States Supreme Court described exploitation as “whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” 371 US at 488 (internal quotation marks omitted). Since at least Kennedy, this court has referred to and used the exploitation analysis announced in Wong Sun in the context of determining whether evidence obtained through voluntary consent searches should be suppressed. See Kennedy, 290 Or at 501 (“[E]vidence [gained from a consent search during or after alleged police illegality] is to be suppressed only if it is found that the consent was gained by exploitation of the illegality *73 or that defendant’s free will was tainted by the illegal police conduct.” (Citing other state and federal jurisdictions that apply Wong Sun to consent searches.)). The United States Supreme Court also has used exploitation analysis in the context of consent searches, even when the consent was “voluntary,” in the sense that it was not coerced. See, e.g., Florida v. Royer, 460 US 491, 501, 507-08, 103 S Ct 1319, 75 L Ed 2d 229 (1983) (voluntary consent to search tainted by illegal detention by police).
The relationship between the voluntariness of consent and exploitation, of course, is a close one. Often, when the circumstances support the determination that consent was voluntary, they also will support the conclusion that there was no exploitation of any prior police misconduct, and the converse also is true. Yet it is important to emphasize that the tests are not identical and that they address separate concerns. As Professor LaFave notes,
“While there is a sufficient overlap of the voluntariness and [exploitation] tests that often a proper' result may be reached by using either one independently, it is extremely important to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was both voluntary and not an exploitation of the prior illegality.”
Wayne R. LaFave, 4 Search and Seizure § 8.2(d), 101 (5th ed 2012) (emphasis in original; footnote omitted).
We agree. Applying both the test for voluntariness of consent and the test for exploitation is necessary to vindicate a defendant’s right to be free from unreasonable search and seizure. When, for example, the police stop an individual without reasonable suspicion, the individual’s liberty is restrained in violation of Article I, section 9. Because the person stopped is unable to terminate the interaction with police, he or she is subject to police authority in excess of constitutional bounds and is thereby placed at a disadvantage relative to the constitutional position that he or she would have occupied in the absence of the illegal police interference. Similarly, when the police invade a person’s protected privacy interest without a warrant (or an exception to the *74 warrant requirement), the person is subject to governmental scrutiny in excess of what the constitution permits. Exploitation analysis recognizes that police conduct that constitutes an illegal stop or an illegal search may fall short of coercing a defendant to consent to a subsequent request to search, but nevertheless may require suppression because the police took advantage of information gained from their illegal conduct or some other aspect of that conduct to obtain consent — an advantage that they would not have had had the police stayed within the bounds of the law. Hall, 339 Or at 27-28. It is that exploitation of the prior police illegality that must be remedied to vindicate an individual’s rights. See State v. Sargent, 323 Or 455, 462-63, 918 P2d 819 (1996) (suppression of evidence required only when the evidence is a product of the constitutional violation); State v. Williamson, 307 Or 621, 626, 772 P2d 404 (1989) (search not valid when consent is “obtained under the pressure of police action that became available to police only by the prior unauthorized conduct”).
With that background, we turn to the exploitation test articulated in Hall. As noted, Hall announced a two-part test for determining whether evidence acquired from a voluntary consent search must be suppressed because the consent was derived from an illegal seizure. First, the defendant must establish a “minimal factual nexus — that is, at minimum, the existence of a ‘but for’ relationship — between the evidence sought to be suppressed and prior unlawful police conduct.” 339 Or at 25. Once the defendant establishes that causal link, the burden shifts to the state to prove that the evidence nevertheless is admissible because “the defendant’s consent was independent of, or only tenuously related to, the unlawful police conduct.” Id. at 34-35.
A. “Minimal Factual Nexus” Test
For the reasons that follow, we disavow the “minimal factual nexus” part of the Hall test. That test was drawn from a case that arose in a significantly different procedural context from Hall, and it did not take into account a relevant statute. Moreover, since this court issued Hall, the test has been unevenly applied and, apparently, has proved confusing to lawyers and judges. Instead, we hold that, when a *75 defendant has established that an illegal stop or an illegal search occurred and challenges the validity of his or her subsequent consent to a search, the state bears the burden of demonstrating that (1) the consent was voluntary; and (2) the voluntary consent was not the product of police exploitation of the illegal stop or search.
Hall adopted the “minimal factual nexus” component of its test from State v. Johnson, 335 Or 511, 73 P3d 282 (2003). In that case, the defendant sought to suppress evidence that had been seized illegally but then later “reseized” pursuant to a warrant. The state asserted that the warrant was “entirely independent of, and was not obtained by exploitation of, the previous illegality.” Id. at 519. Ordinarily, a search performed under authority of a warrant is subject to a presumption of regularity, and the party challenging the evidence bears the burden to prove the unlawfulness of the search or seizure. Id. at 520-21. Before addressing the state’s exploitation argument, the court addressed which party bore the burden with regard to proving exploitation or its absence. Because of the presumption of regularity when the police act under authority of a warrant, the court concluded that the defendant had an initial burden to establish a “factual nexus” between prior illegal police conduct and the evidence gained pursuant to an independently valid warrant. Id. Once a defendant demonstrates that nexus, the court in Johnson wrote, “the presumption of regularity [of the warrant] is undermined and the burden of proof fairly may be shifted to the government to show that the evidence is not tainted by the misconduct.” Id. at 521.
This court’s reliance in Hall on Johnson was misplaced. By statute, whenever a defendant challenges evidence seized following a warrantless search, the state bears the burden of proving “by a preponderance of the evidence the validity of the search.” ORS 133.693(4); State v. Tucker, 330 Or 85, 87, 997 P2d 182 (2000). When the police perform a search and seize evidence without a warrant, as in Hall and in this case, there is no presumption of regularity to overcome, because there was no warrant and, thus, there is no need for a threshold showing by the defendant to shift the burden to the state. The state already has the burden to prove that the warrantless search was valid.
*76 Moreover, under the Hall test, parties were required to first focus on whether or not a “minimal factual nexus” existed before examining the more central issues of (1) whether the police had acted unlawfully in making the initial stop or search; and (2) whether the later consent to search and subsequently discovered evidence were obtained through exploitation of the unlawful police conduct. However, exploitation analysis already considers the existence of a “minimal factual nexus,” because determining whether the police exploited their unlawful conduct to gain the disputed evidence necessarily requires an examination of the causal connection between the police conduct and the defendant’s consent. Accordingly, the “minimal factual nexus” test is not analytically significant in determining whether the consent to search was the product of the illegal police conduct, such that evidence obtained pursuant to that search must be suppressed.
Because the “minimal factual nexus” test adopted in Hall does not have firm grounding in our case law and is inconsistent with ORS 133.693(4) — and because the application of the test has been unclear in our cases since Hall and has proved confusing to litigants and the courts — we disavow that part of the Hall analysis.
B. Exploitation Test
We now turn to the remaining — and more central— part of the Hall exploitation test. That test requires the state to prove “that the defendant’s consent was independent of, or only tenuously related to, the unlawful police conduct.” 339 Or at 35. Hall posited two scenarios that may require suppression:
“A causal connection requiring suppression may exist because the police sought the defendant’s consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant’s free will, significantly affected the defendant’s decision to consent.”
Id. Hall identified several considerations relevant to determining whether the “causal connection” between the unlawful *77 police conduct and the defendant’s decision to consent is sufficiently strong that the police can be said to have “exploited” their unlawful conduct to gain the consent, thus requiring suppression of the evidence obtained:
“(1) the temporal proximity between the unlawful police conduct and the defendant’s consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances — such as, for example, a police officer informing the defendant of the right to refuse consent— that mitigated the effect of the unlawful police conduct.”

Id.

The state asserts that the Hall test does not afford sufficient weight to a defendant’s decision to voluntarily relinquish his or her Article I, section 9, right to be free from unreasonable governmental searches and seizures because, under Hall, suppression almost always will be required when consent is granted in close temporal proximity to an illegal stop. In Hall itself, the court required suppression, “[g]iven the close temporal proximity between the illegal detention and [the] defendant’s consent, and the absence of any intervening circumstances or other circumstances mitigating the effect of that unlawful police conduct.” Id. at 36. This court’s cases following Hall have reached similar results. See, e.g., State v. Ayles, 348 Or 622, 636-39, 237 P3d 805 (2010) (evidence suppressed under Hall when statements were made in response to officer questions in close temporal proximity to police illegality and Miranda warnings alone were not sufficient to “ensure that the unlawful police conduct did not affect, or had only a tenuous connection to, [the] defendant’s responses”); State v. Rodgers/Kirkeby, 347 Or 610, 630, 227 P3d 695 (2010) (evidence suppressed under Hall when consent granted in close temporal proximity to illegal stop and state failed to demonstrate intervening or mitigating circumstances).
We agree that the exploitation test announced in Hall does not account sufficiently for the importance of a defendant’s voluntary consent to search. Our cases demonstrate that, in some situations, a defendant’s voluntary consent itself may be sufficient to demonstrate that the unlawful conduct did not affect or had only a tenuous connection *78 to the evidence produced. See Rodriguez, 317 Or at 41-42; Williamson, 307 Or at 626 (both rejecting proposition that consent “can never legitimize” a search following illegal police conduct). That legal determination — whether, in the circumstances of a particular case, consent has so attenuated the connection between the prior illegal conduct and the evidence obtained in the consent search — requires a court to consider the illegal conduct that comprised the stop or search, the character of the consent, and the causal relationship between the two. In Kennedy, for example, the defendant’s consent was not “tainted” by the illegal police conduct when there was an “absence of any coercive circumstances surrounding [the] defendant’s consent” and the defendant had volunteered consent without prompting from the officers. 290 Or at 504, 506.
The court in Hall asserted that the unprompted grant of consent in Kennedy and a similar volunteering of consent in Rodriguez were intervening circumstances that indicated that there was, at most, a tenuous causal connection between the consent and the prior illegal police conduct. See Hall, 339 Or at 34. Hall, however, suggested that, had the police asked for (and obtained) the defendant’s consent in Rodriguez — rather than the defendant having volunteered to be searched — suppression would have been required. Id. By asserting that an unprompted consent is an intervening circumstance sufficient to mitigate the causal impact of the prior illegality, while positing that a requested consent on the same facts would demonstrate the necessary causal connection, Hall could be read as effectively having created a per se rule that evidence gained from a requested consent search always must be suppressed if that request occurs in close temporal proximity to the illegal stop and no intervening or mitigating circumstances exist.
We agree with the state that such a per se rule is untenable. A consent to search that is unprompted or unilateral is relevant evidence of the voluntariness of the consent; as recognized in Kennedy and Rodriguez, unprompted or volunteered consent is less likely to be a product of illegal police conduct. However, the fact that an officer requested consent does not demonstrate that the officer necessarily *79 exploited the prior illegal conduct to gain consent. Rodriguez, for example, involved a voluntary consent following an illegal arrest. The officer did not directly ask the defendant for consent to search, but he did ask the defendant if he had any drugs or guns in his apartment. Rodriguez, 317 Or at 41. In response to that question, the defendant said, “No, go ahead and look.” Id. So, even if the defendant’s consent in Rodriguez was “volunteered,” that consent was, in fact, prompted by the officer’s question about drugs and guns. Rodriguez concluded, nevertheless, that the officer “did not trade on or otherwise take advantage of the arrest to obtain defendant’s consent” in light of the factual circumstances, including the manner in which the defendant had given consent. Id.
Properly considered, then, a voluntary consent to search that is prompted by an officer’s request can be sufficient to demonstrate that the consent is unrelated or only tenuously related to the prior illegal police conduct. Whether the voluntary consent is sufficient- — or whether the police exploited their illegal conduct to obtain consent — will depend on the totality of the circumstances. We reject the state’s position that voluntary consent during an unlawful stop or search always breaks the causal chain and makes the evidence admissible, as we likewise reject defendant’s argument that such consent, standing alone, will rarely, if ever, break the causal chain. Voluntary consent, while important, is not dispositive and does not relieve courts of undertaking the fact-specific exploitation analysis.
We also conclude that Hall erred in focusing exclusively on “temporal proximity” and the presence of mitigating or intervening circumstances in determining whether the police exploited unlawful conduct to obtain consent to search.[7] The court in Hall correctly stated that determining *80 whether the defendant’s voluntary consent derived from unlawful police conduct involved a “fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection.” 339 Or at 35. But the only “considerations” that the court mentioned as relevant to that inquiry were the temporal proximity between the illegal police conduct and the voluntary consent; the existence of intervening circumstances; and the presence of circumstances that might mitigate the effect of the police misconduct, such as Miranda warnings or the police advising the defendant of his right to refuse consent. Id. at 35, 35 n 21. Subsequent cases have understandably focused on the considerations highlighted in Hall. Those considerations are appropriate, of course; however, in our view, determining based on the totality of the circumstances whether the police exploited the prior unlawful conduct to obtain consent often will involve additional considerations, as this case illustrates.
As discussed, our task is to determine whether police “exploited” or “took advantage of’ or “traded on” their unlawful conduct to obtain consent, or — examined from the perspective of the consent — whether the consent was “tainted” because it was “derived from” or was a “product of’ the unlawful conduct.[8] In making that determination, it *81 seems obvious that, in many cases, the nature of the illegal conduct will be a relevant consideration. Unlawful police conduct can take many forms, from a daytime trespass by following a path around the lower level of the defendant’s house from a front door to a back door, as in this case, to an unlawful arrest followed by lengthy interrogation at a police station. If the conduct is intrusive, extended, or severe, it is more likely to influence improperly a defendant’s consent to search. In contrast, where the nature and severity of the violation is limited, so too may be the extent to which the defendant’s consent is “tainted.” And where the taint is limited, the degree of attenuation necessary to purge the taint is correspondingly reduced. See Ayles, 348 Or at 654 (Kistler, J., dissenting). Thus, voluntary consent to a search in those circumstances is more likely to be sufficient to demonstrate that the consent was “independent of, or only tenuously related to, the unlawful police conduct.” Hall, 339 Or at 35.
An overlapping but distinct concern relevant to whether a defendant’s consent resulted from exploitation of police misconduct is the “purpose and flagrancy” of the misconduct. The “purpose and flagrancy” inquiry comes from Brown v. Illinois, 422 US 590, 603-04, 95 S Ct 2254, 45 L Ed 2d 416 (1975), where the United States Supreme Court described the “purpose and flagrancy of the official misconduct” as relevant to exploitation analysis under the Fourth Amendment. In Wolfe, this court explained that the Brown exploitation factors, including “purpose and flagrancy,” were relevant in determining the effect of police misconduct on the voluntariness of a defendant’s consent to search. 295 Or at 572. In Hall, however, the court asserted that “purpose and flagrancy” “relates to only the deterrence rationale of the Fourth Amendment exclusionary rule and has no applicability to the exclusionary rule under Article I, section 9.” 339 Or at 35 n 21. Although the court in Hall reiterated the “rights-based” rationale of Article I, section 9, and contrasted it with the “deterrence” rationale of the Fourth Amendment, see id. at 22-25, it did not explain why *82 “purpose and flagrancy” is not compatible with the “rights-based” approach. On reflection, we think that it is.[9]
Particularly flagrant conduct — such as excessive use of force in unlawfully arresting a defendant, the unlawful forcible entry into a home by multiple officers wielding automatic weapons, or unlawful and lengthy in-custody interrogation — is more likely to affect the defendant’s decision to consent than more restrained behavior. See Brown, 422 US at 593-94, 604-05 (where officers broke into the defendant’s apartment, searched it, and arrested him at gunpoint without probable cause, the defendant’s subsequent statements were tainted by flagrant police misconduct); State v. Olson, 287 Or 157, 159-60, 166, 598 P2d 670 (1979) (where officers entered the defendant’s home at night without consent and arrested him, the defendant’s subsequent statements were tainted by police misconduct).[10] By seeking consent after engaging in such flagrant violation of the defendant’s constitutional rights, the police improperly exploit their misconduct, because they have placed the defendant “in a worse position than if the governmental officers had acted within the bounds of the law.” See Hall, 339 Or at 25. Although every police illegality places an individual in a worse position than if no illegality had occurred, it is a matter of degree. Officers who engage in particularly egregious or intimidating misconduct place the individual in a more disadvantaged position, making it easier and more likely for the officer to exploit that illegality to obtain consent. Excluding the subsequently discovered evidence vindicates the defendant’s rights and thus is consistent with the rights-based rationale underlying Article I, section 9.
Similarly, the “purpose” of the police misconduct may be a relevant consideration in the exploitation analysis *83 in some circumstances. Our cases have rejected constitutional principles that would involve the court in unstructured analysis of a person’s subjective understandings, whether that person is a police officer or a defendant. See Ashbaugh, 349 Or at 309-16 (reconsidering and rejecting as component of test for “seizure” under Article I, section 9, whether person had “subjective belief’ that they had been seized); Hall, 339 Or at 28 n 16 (rejecting notion that “a police officer’s state of mind is relevant under Article I, section 9”). Instead, this court has focused on objective circumstances, behavior, and verbal comments. See Ashbaugh, 349 Or at 316 (focus is on “objective” circumstances of police conduct and what a reasonable person would believe based on the circumstances). However, in some cases, those objective circumstances may indicate the police purpose in engaging in conduct later determined to be unlawful. So, too, may statements that police make at the time or in a later court proceeding. Whether expressed through conduct or comments, the “purpose” of what is later determined to be unlawful police conduct could well be relevant both to understanding the nature of the misconduct and, ultimately, to deciding whether the police exploited that misconduct to obtain consent to search. Again, while Hall dismissed the relevance of police “purpose” in a footnote, in our view, that purpose may be an appropriate consideration in the rights-based analysis under Article I, section 9, at least in some circumstances.
Our point here is that, while Hall correctly stated that the exploitation inquiry involved consideration of the “totality of the circumstances,” that decision’s focus on temporal proximity and intervening and mitigating circumstances was too narrow, because, at least by implication, it excluded other relevant considerations. The nature, extent, and severity of police misconduct — and, relatedly, the purpose and fiagrancy of that misconduct — can vary dramatically, and ignoring the very different effects that police conduct may have on an individual’s consent to a search is neither reasonable nor constitutionally required.
The dissenting opinions make some thoughtful, although ultimately unpersuasive, arguments concerning our exploitation analysis. Most of those arguments are addressed directly or indirectly elsewhere in this opinion, but *84 several deserve brief additional responses. Justice Baldwin and Justice Walters suggest that we have modified the Hall analysis to remove the presumption that a consent search following unlawful police conduct is “tainted” or is invalid. On the contrary, the first part of this opinion in fact eliminates the requirement in Hall that the defendant show a “minimal factual nexus” between unlawful police conduct and the defendant’s consent before any burden shifts to the state. See 356 Or at 74 (discussing Hall, 339 Or at 34-35). Instead, we view that requirement, which placed an initial burden on the defendant, as being encompassed in the general exploitation analysis. As to that analysis, we adhere to Hall in requiring the state to prove that the consent was independent of, or only tenuously related to, the illegal police conduct. 356 Or at 74-75; Hall, 339 Or at 35.
Justice Walters and Justice Brewer raise concerns about considering the degree or severity of different constitutional violations as part of the exploitation test. We acknowledge the difficult weighing that may be involved in some circumstances. Yet those challenges cannot be avoided when, as here, the relevant constitutional text prohibits only “unreasonable” searches and seizures; our cases, including Hall, admonish us to make that determination based on the “totality of the circumstances”; and the considerations that we have identified as relevant to that determination cut both ways. In our view, to treat a police trespass onto a defendant’s property to reach and knock on a back door no differently in terms of its causal effect on defendant’s voluntary consent than if the police had broken down all the doors simultaneously, entered the home with guns drawn, and arrested defendant — simply because both scenarios involve violations of Article I, section 9 — is to ignore reality. A per se rule — either the rule advocated by the state, that voluntary consent (almost always) trumps prior unlawful police conduct, or its opposite, that unlawful police conduct (almost always) trumps later voluntary consent — fails to account for the myriad variety of circumstances in police-citizen interactions. Moreover, it is not even clear that a per se rule would have the benefit of predictability, as the threshold issue of whether police acted unlawfully can, in some circumstances, involve close factual questions and is, *85 of course, subject to the general “reasonableness” test of Article I, section 9.
Relatedly, Justice Brewer and Justice Baldwin express concern that the principles that we apply here would countenance constitutional violations as long as the police are polite or courteous. We do recognize, in contrast to Hall, that the purpose and flagrancy of any prior illegality may be relevant to the determination of whether later voluntary consent was the product of the police misconduct. However, we do not hold that polite police misconduct necessarily means that the subsequent consent is valid. Indeed, in State v. Musser, 356 Or 148, 335 P3d 814 (2014), also decided today, after reviewing all the facts related to the unlawful police conduct and the defendant’s subsequent consent to a search, we concluded that the officer had exploited his unlawful conduct to obtain the consent. We therefore suppressed the evidence in that case, notwithstanding the fact that the police conduct was restrained and courteous.
C. Summary
In an effort to clarify this complicated area of law, we again review the basic principles at issue. As noted, the overarching inquiry is whether the evidence that the state seeks to introduce must be suppressed because that evidence was obtained in violation of the defendant’s constitutional rights. In the context of Hall, where an illegal stop preceded a consent to search, or in the context of this case, where unlawful entry onto defendant’s property preceded the consent to search, that inquiry has two prongs. First, the court must assess whether the consent was voluntary. If the consent to search was not voluntary, then the evidence must be suppressed, because only a voluntary consent to search provides an exception in this context to the warrant requirement of Article I, section 9. See, e.g., State v. Guggenmos, 350 Or 243, 261-62, 262 n 8, 253 P3d 1042 (2011) (finding no reason to determine whether exploitation analysis would require suppression of evidence because determination that consent was not voluntary required suppression); Williamson, 307 Or at 626-27 (Carson, J., concurring) (“The validity of [the defendant’s] consent determines the outcome of this case. If the consent were involuntary *86 and, thus, invalid, the subsequent search and resulting seizure, arrest, and conviction likewise were invalid.”).
Second, even if the consent is voluntary, the court must address whether the police exploited their prior illegal conduct to obtain the evidence. Exploitation may be found if, for example, the police illegally stop a vehicle, allowing them to view contraband that otherwise would not have been visible, and then request the driver’s consent to search the vehicle as a result of what they saw. In that example, there may be a direct causal connection between the prior illegal stop and the consent because the request for consent itself (and the evidence gathered) resulted from police knowledge of the presence of that evidence, which they had only because they had observed it during the illegal stop. See Hall, 339 Or at 35 (“A causal connection requiring suppression may exist because the police sought the defendant’s consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct.”). We articulated those principles in Hall and other cases, and we adhere to them.
Hall also held that evidence may be subject to suppression if the police obtained the consent to search through less direct exploitation of their illegal conduct. Id. We adhere to that principle as well. As discussed previously, Hall stated that the exploitation analysis required consideration of the totality of the circumstances to determine whether the state had carried its burden of proving that the consent was independent of, or only tenuously related to, the unlawful police conduct. However, the only considerations that that case mentioned in analyzing whether the police had exploited their illegal conduct to obtain consent were the temporal proximity between the illegal police conduct and the consent and the presence of any intervening or mitigating circumstances. Id. at 35, 35 n 21. In this opinion, we have identified additional considerations that are relevant to that inquiry, including an assessment of the actual police misconduct. We have explained that the nature, extent, and severity of the constitutional violation are relevant, as are the purpose and flagrancy of the misconduct. Depending on the circumstances of the particular case, other considerations may be relevant to the exploitation inquiry. Professor LaFave, summarizing state and federal cases, writes:
*87 “In determining whether the consent was, as the Court put it in Brown, ‘obtained by exploitation of an illegal arrest,’ account must be taken of the proximity of the consent to the arrest, whether the seizure brought about police observation of the particular object which they sought consent to search, whether the illegal seizure was ‘flagrant police misconduct,’ whether the consent was volunteered rather than requested by the detaining officers, whether the arrestee was made fully aware of the fact that he could decline to consent and thus prevent an immediate search of the car or residence, whether there has been a significant intervening event such as presentation of the arrestee to a judicial officer, and whether the police purpose underlying the illegality was to obtain the consent.”
LaFave, 4 Search and Seizure § 8.2(d) at 109-12 (footnotes omitted).
Article I, section 9, prohibits “unreasonable” searches and seizures, and exploitation analysis is necessarily nuanced. As the preceding discussion demonstrates, the test for whether a consent search conducted following an illegal search or stop comports with Article I, section 9, cannot be reduced to a simple formula.
IV. APPLICATION
In applying the principles discussed above to the present case, we begin by clarifying what is not at issue — the unlawfulness of the detectives’ conduct and the voluntariness of defendant’s consent. As to the first issue, the Court of Appeals determined that “the [detectives] trespassed when they entered defendant’s backyard and knocked on his back door, and the trespass violated defendant’s Article I, section 9, rights.” Unger, 252 Or App at 483. On review, the state accepts that the detectives were unlawfully in defendant’s backyard when they obtained his consent to enter his house. As to the second issue, the trial court determined that defendant’s consent was “freely and voluntarily made,” and defendant does not challenge that ruling on review. Thus, the only issue on review is whether the detectives exploited the unlawful entry into defendant’s backyard to obtain his consent. And that issue, in this case, is a narrow one, because there is no indication that the detectives learned of incul-patory evidence as a result of their unlawful conduct and *88 therefore sought consent to search. Compare Hall, 339 Or at 35. Rather, the unlawful conduct simply put the detectives in a place where they could initiate contact with the occupants of the house. Thus, the question reduces to whether the police exploited the unlawful conduct to obtain defendant’s consent to search.
To determine whether the state has met its burden of showing that defendant’s consent was not the product of the unlawful police conduct, we consider the totality of the circumstances, including the temporal proximity between that misconduct and the consent, and the existence of any intervening or mitigating circumstances. We also consider the nature, purpose, and flagrancy of the misconduct. Because the analysis is a fact-intensive inquiry, we return to the facts.
In response to a complaint about drug activity at defendant’s house, as well as information from an informant about the presence of children and concerns that the drugs and guns were accessible to the children, four detectives went to the house around 10:00 a.m. to conduct a “knock- and-talk.” The detectives had been told that the children “had actually gotten their hands on the cocaine” and “that there were so many guns in the residence that the children at some point had to walk over the guns.” Detectives knocked at two separate doors at the front of the house and received no response. One detective, Roberts, followed a path around the lower level of the house to a wraparound porch at the back of the house and knocked on a sliding glass door. When defendant came to the door, Roberts introduced himself as “Kevin with the sheriffs office” and advised defendant of the drug complaint. The detectives obtained defendant’s voluntary consent to enter the house. At least two of the other detectives joined Roberts at the sliding glass door sometime during the initial interaction.
Defendant led the detectives through what turned out to be a bedroom and into the kitchen where the detectives introduced themselves, and Roberts explained to defendant that when a drug complaint is received and “when kids are involved,” the detectives “talk to the homeowner and ask for permission and if [the homeowner] would show [them] *89 around the house.” Defendant was “cooperative” and agreed to show the detectives around the house. It was during that tour of the house that Roberts discovered the sandwich bag with methamphetamine residue that provided the basis for defendant’s arrest and the subsequent search warrant.[11]
In framing the exploitation inquiry, we first note that the detectives were on defendant’s property without his permission, which constituted trespass. The state concedes that, at least after the detectives left the front door and followed a path to the sliding glass door in back, that trespass was a “search” of defendant’s property without probable cause, in violation of Article I, section 9. As we discuss in greater detail below in connection with the purpose and flagrancy of the detectives’ conduct, however, that unlawful conduct simply brought the detectives, during daylight hours, to a door of the house, which defendant opened. A conversation ensued, and defendant voluntarily consented to the detectives entering the house. The detectives’ conduct did not rise to the level of an unlawful arrest or stop. The detectives did not unlawfully enter defendant’s home or ignore any gates or “no trespassing” signs. Within the universe of possible unlawful police activity, the trespass here was limited in “extent, nature, and severity.” Ayles, 348 Or at 654 (Kistler, J., dissenting) (degree of attenuation required to purge taint of unlawful police conduct varies with “extent, nature, and severity of any illegality”); see also U.S. v. Perea-Rey, 680 F3d 1179, 1188 (9th Cir 2012) (for Fourth Amendment purposes, the “constitutionality of * * * entries into the curtilage hinges on whether the officer’s actions are consistent with an attempt to initiate consensual contact with the occupants of the home. Officers conducting a knock and talk * * * need not approach only a specific door if there are multiple doors accessible to the public.”). Nothing in the record suggests that the interaction between the detectives and defendant, including his voluntary consent to the search, was any *90 different than it would have been if he had answered the initial knock at his front door.
We also consider in the exploitation analysis the temporal proximity between the misconduct and the defendant’s consent. The detectives were trespassing on defendant’s property when they obtained his consent to enter his home. Moreover, there is no indication that any significant amount of time elapsed between the detectives’ initial entry onto defendant’s property and defendant’s subsequent consent to show the detectives around the home. Both of defendant’s consents occurred during or shortly after the detectives’ unlawful conduct. See Hall, 339 Or at 36 (noting close temporal proximity between consent and unlawful stop of the defendant). Temporal proximity weighs in defendant’s favor.
The state does not identify any intervening or mitigating circumstances, such as providing Miranda warnings or admonitions to defendant that he could refuse to consent to a search.[12] As discussed above, however, we emphasize that the focus should remain on whether the totality of the circumstances indicates that the detectives exploited their unlawful conduct to obtain consent. Temporal proximity and intervening or mitigating circumstances are not the only considerations.
We next consider the “purpose and flagrancy” of the detectives’ actions, which involves a closer look at the nature and extent of the unlawful police conduct. We do not inquire into the subjective intent or motivations of the detectives, but rather examine statements made by the detectives and the undisputed facts surrounding the contact with defendant. Here, the detectives were following up on information *91 about drug activity at defendant’s home, including information that there were children in the home who had been exposed to both drugs and a large volume of guns. The detectives permissibly knocked on the front door of defendant’s home. Although there was no response, several cars were in the driveway, and the detectives thought that someone likely was home, so they followed a path around the house to another door and knocked on it. Their purpose— both in knocking on the front door and later on the sliding glass door — was to contact the homeowner to ask for permission to search the house, not to search for incriminating evidence near the back door. See Perea-Rey, 680 F3d at 1187-88 (under Fourth Amendment, officers are permitted to “approach a home to contact the inhabitants” and “need not approach only a specific door”). Moreover, there is no indication that the purpose of going to the back door was that defendant would be more likely to consent at the back door, rather than the front door.
In contrast, when police observe contraband because they have unlawfully stopped someone or unlawfully entered a home — and then ask for consent to search, their “purpose” is more likely to be to seize the contraband that they already have seen as a result of their misconduct. In those circumstances, the police have “taken advantage of’ or “exploited” their unlawful conduct to the defendant’s detriment, and that tainted “purpose” suggests that the defendant’s consent, even if voluntary, also may be tainted. So, too, may be a consent that follows a random stop or seizure that lacks probable cause or reasonable suspicion that a crime has been committed and that is nothing more than a fishing expedition for incriminating evidence. LaFave, 4 Search and Seizure § 8.2(d) at 111-12, 112 n 154. This case presents none of those scenarios.
Moreover, the detectives’ conduct in walking around defendant’s house to knock on his door was not flagrant or egregious. The detectives followed a path around the side of the house to the back door, which defendant could have chosen not to open. The detectives did not have to cross any barriers or use force to reach that door; they did not force or even open the door themselves; and there is no indication that defendant had made any effort to keep that space private. *92 Compare U.S. v. Robeles-Ortega, 348 F3d 679, 680-81, 684 (7th Cir 2003) (concluding that evidence was tainted where consent to search was given after “the officers literally broke down the door, without exigent circumstances and without a warrant, and at least five agents rushed into the apartment with guns”). When defendant opened the door, the detectives introduced themselves, explained why they were there, and asked for consent, just as they would have at the front door. Thus, although the detectives’ conduct allowed them to contact defendant, the unlawful conduct in which the detectives engaged was not flagrant. In short, nothing about the limited nature of the unlawful conduct, or the purpose or flagrancy of the conduct, suggests that it caused defendant to consent to the search.
Defendant, for his part, does not argue that anything about the nature of the trespass or his interactions with the detectives significantly affected his consent. Rather, he contends that, if the detectives had not unlawfully entered his backyard, they never would have been able to make contact with him and obtain his consent. In other words, defendant argues, “the illegal trespass placed the [detectives] in a position to request defendant’s consent,” and, “but for” that illegal conduct, “the [detectives] would not have been in a position to obtain defendant’s consent.” However, this court in Hall — the case on which defendant relies — rejected that formulation of the attenuation analysis. Hall, 339 Or at 25 (“[T]his court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained ‘but for’ unlawful police conduct.”). That part of Hall, along with other parts that we reaffirm, remains sound. Where a defendant has consented voluntarily to a search following police misconduct, we consistently have held that mere but-for causation is insufficient to justify suppression of the evidence, even in the absence of intervening or mitigating circumstances. Here, the state has met its burden of showing that, under the totality of the circumstances, the detectives in this case did not exploit their unlawful entry into defendant’s backyard to obtain his consent to enter the house or to obtain his consent to show the detectives around his house.
*93 V. CONCLUSION
Encounters between the police and citizens can take many different forms. Although unlawful police conduct undoubtedly has an effect on citizens and on how they interact with police officers in certain circumstances, our cases reject the notion that unlawful police conduct necessarily requires suppression of evidence discovered following such conduct. See Hall, 339 Or at 25 (“[T]his court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained ‘but for’ unlawful police conduct.”).
For the reasons stated above, we disavow the minimal factual nexus test described in Hall. We adhere to the view expressed in Hall that a defendant’s voluntary consent to search, following unlawful police conduct, may nevertheless require suppression of evidence obtained during the search, if the police exploited their unlawful conduct to gain that consent. However, we modify the exploitation analysis in Hall, which considered only the temporal proximity between the unlawful police conduct and the consent and mitigating or intervening circumstances. Rather, courts must consider the totality of the circumstances, as described above, including the nature of the illegal conduct and its purpose and flagrancy, without unduly emphasizing any single consideration.
We share the dissenters’ concerns about stability in our case law and protecting Article I, section 9, rights. This case does not damage either. Although we have clarified and modified in part the analysis set out in Hall, the narrow issue on which we focus here, as Justice Brewer correctly notes, is a “vexing cranny” of our search and seizure law. 356 Or at 118 (Brewer, J., dissenting). Professor LaFave reminds us that there is “overlap” in the voluntariness and exploitation tests. LaFave, 4 Search and Seizure § 8.2(d) at 101. If unlawful police conduct leads to consent to search, the consent may be “involuntary” and also the “product” of the unlawful conduct. Conversely, the same facts that demonstrate that a particular consent was voluntary also may support a conclusion that the consent was not the result *94 of exploitation of unlawful conduct — or that the police conduct was not unlawful in the first place. The less common (although not rare) situation presented in this case is that the state no longer argues that the police conduct was lawful and defendant no longer argues that his consent was involuntary. That procedural posture means that those critical issues are not before us, and we are instead presented with the narrow and specific exploitation issue that we have considered in detail above.
Moreover, we expect that law enforcement officers will act within constitutional limitations in their interactions with Oregon citizens. Civil litigation, tort claims, and training and education — as well as the exclusionary rule — help protect Article I, section 9, rights. We also expect that trial courts will carefully consider claims of unlawful police conduct, disputes over the voluntariness of consent, and whether consent, even if voluntary, was the product of unlawful police conduct — and will make findings of fact when appropriate. An appropriate record will help the appellate courts in our ongoing effort to develop principled and meaningful applications of the fundamental prohibition on unreasonable searches and seizures in Article I, section 9.
The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.[13]

 Article I, section 9, of the Oregon Constitution provides:
“No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue hut upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.”

 In ruling on defendant’s motion to suppress, the trial court stated, “I find that [defendant] allowed [the detectives] consensual entry into the house and three out of the four of [the detectives] came through the back door * * The trial court did not address whether or how the fourth detective had entered the house.

 Defendant also cited the Fourth Amendment to the United States Constitution in his motion to suppress, but he does not make any argument under the Fourth Amendment before this court.

 The Court of Appeals issued its decision in Unger before this court had issued its decision in Hemenway modifying the Hall analysis.

 On review, the state disputes the Court of Appeals’ characterization of its argument before that court. The state notes that it did argue that the consent was insufficiently related to the illegal conduct to justify suppression because it argued that, at most, the illegality gave the detectives the opportunity to request consent. That connection, argued the state, would establish only “but for” causation, which would not demonstrate that the detectives had exploited their illegal conduct to obtain defendant’s consent.

 The majority also discussed and disavowed parts of State v. Quinn, 290 Or 383, 623 P2d 630 (1981), which had relied extensively on Wong Sun. The court’s rejection of the result in Quinn was based on the difference between the state and federal exclusionary rules and Quinn’s questionable application of Wong Sun, but Hall did not reject Quinn’s endorsement of the Wong Sun exploitation analysis. Hall, 339 Or at 26-30.

 The court in Hall correctly recognized that evidence obtained following unlawful police conduct also will be admissible if the state can prove that the evidence “inevitably” would have been discovered through lawful procedures or that the police obtained the disputed evidence “independently” of the violation of the defendant’s rights. 339 Or at 25. However, those considerations are not part of the more focused inquiry as to whether the causal connection between the unlawful conduct and the defendant’s consent requires suppression, and neither in Hall nor in this case did the state argue “inevitable discovery” or “independent source” as grounds of admissibility of the disputed evidence.

 This court and the federal courts have used a variety of verbal formulations in an effort to capture one general concept: that some voluntary and otherwise valid consents to search are nevertheless influenced by prior unlawful police conduct to the extent that evidence obtained from the search should be suppressed under the applicable constitutional standard. See Hall, 339 Or at 22 (examining whether evidence must be excluded, despite voluntary consent, because that consent “derived from — or, stated differently, was obtained by ‘exploitation’ of — the unlawful stop” (emphases added)); Wong Sun, 371 US at 488 (explaining that courts must examine whether evidence “has been come at by exploitation” of a prior illegality (internal quotation marks omitted; emphasis added)); Brown v. Illinois, 422 US 590, 600, 604, 95 S Ct 2254, 45 L Ed 2d 416 (1975) (applying Wong Sun to determine whether the defendant’s statements were obtained by “exploitation of the illegality of his arrest”); Rodriguez, 317 Or at 41 (concluding that INS agent “did not trade on or otherwise take advantage of’ unlawful arrest to obtain the defendant’s consent to search (emphases added)); Ashbaugh, 349 Or at 307, 318 (examining whether consent search of the defendant’s purse “in some sense derived from” prior unlawful police stop and concluding that consent was not “the product of” an unlawful stop (emphasis in original)); Rodgers/Kirkeby, 347 Or at 628-30 (explaining that evidence may be excluded where “a defendant’s [voluntary] consent was derived from, or was the product of, the prior police illegality” and concluding that consent given during unlawful extension of traffic stop was the product of that unlawful seizure (emphases added)); Royer, 460 US at 501 (noting that prior cases have held that “statements given during a period *81 of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will” (emphasis added)).

 Justice Landau’s concurring opinion argues that this court took a wrong turn in rejecting deterrence as one rationale for excluding evidence because it was obtained in violation of Article I, section 9, and relying exclusively on a “rights-based” rationale. 356 Or at 94-103 (Landau, J., concurring). We need not address that issue, interesting as it is, because we reach the same result based on this court’s existing rights-based approach.

 Conversely, the absence of flagrant or egregious police conduct, even in a situation where the defendant’s Article I, section 9, rights have been violated, can be relevant considerations in determining whether police exploited their misconduct to obtain consent.

 It is not clear from the motion to suppress or from the briefing whether defendant argues that the detectives exploited their unlawful entry into defendant’s backyard to obtain (1) defendant’s consent to enter the house; (2) defendant’s consent to take the detectives on a tour of the house; or (3) both. For purposes of this opinion, we assume that defendant is arguing that both the entry and the search of the house violated his Article I, section 9, rights.

 As noted earlier, the officers told defendant, once in the house, that he could refuse consent to search. They did not, however, tell him that he could refuse to consent to their entry at the time that they entered the house. Such admonitions, although not required, may be helpful when the state seeks to show that it did not exploit any police misconduct to obtain consent. See Hall, 339 Or at 35 (describing “police officer informing the defendant of the right to refuse consent” as a circumstance that may mitigate “the effect of the unlawful police conduct”). See also LaPave, 4 Search and Seizure § 8.2(i) at 152-55 (admonitions or warnings not required, but may be significant in determining validity of consent to search).

 In addition to the issue raised before this court, defendant raised four other assignments of error before the Court of Appeals. Although the court rejected two of those assignments of error without discussion, the court declined to reach defendant’s other two assignments of error because it was unnecessary given the court’s disposition in the case. See Unger, 252 Or App at 479 n 2. Because we reverse the Court of Appeals, we remand for the Court of Appeals to consider the remaining two assignments of error.