Argued and submitted December 15, 2014, conviction for driving under the influence of intoxicants reversed and remanded; otherwise affirmed September 23, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

FABIOLA SANCHEZ,
*Defendant-Appellant.*

Marion County Circuit Court
11C48706; A154007

359 P3d 563

Kyle Krohn, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Michael S. Shin, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Lagesen, Presiding Judge, and Flynn, Judge, and De Muniz, Senior Judge.

LAGESEN, P. J.

## LAGESEN, P. J.

A jury convicted defendant of driving under the influence of intoxicants (DUII), ORS 813.010, and failure to perform the duties of a driver when property is damaged, ORS 811.700. Before trial, the trial court suppressed some, but not all, of the evidence that officers obtained after conducting an unlawful search of defendant's backyard. On appeal, defendant assigns error to the trial court's decision not to exclude all of the evidence obtained after the unlawful search. We affirm in part and reverse in part, concluding that the trial court erred by not suppressing all of the evidence obtained after the unlawful search, but that that error is harmless with respect to defendant's conviction for failure to perform the duties of a driver when property is damaged.

### BACKGROUND

Defendant and a male companion were driving home at around 5:00 a.m. when defendant collided with a parked car around the corner from her house. Defendant was driving; her companion was the passenger. The owner of the car heard the collision and came out of his house to discuss it with defendant, who, along with her companion, had stepped out of the truck. When the owner of the car went to get a pen or a pencil to write down defendant's information, defendant and her companion decided to go home. When the car owner returned, defendant told him that she was going home. She and her companion got into the truck and drove away. The car owner wrote down the truck's license plate as they were leaving and reported the collision to police.

The report came in at 5:09 a.m. At that time, the night shift officers were still on duty; the shift change was scheduled to take place at 6:00 a.m. Deputy Lane was one of those night shift officers, and he responded to the report of the hit-and-run. Within 10 to 12 minutes of receiving the accident report, Lane had located defendant's truck in the driveway of her duplex. He then alerted dispatch of his location, and requested the assistance of another deputy. While he was waiting for the other deputy to arrive, Lane knocked on defendant's front door for a "minute and a half to two minutes." No one answered the door.

The next deputy—Hunter—arrived. Lane had Hunter stay at the front door while Lane checked the back of the house. To check the back of the house, Lane went through a latched gate into the fenced backyard and began looking into all the windows along the back of the house using a flashlight. When Lane reached an open window with a curtain, he pushed the curtain aside and saw defendant and a man in bed. Lane "used his flashlight to illuminate the room" and "announced 'sheriff's office.'" That caused defendant and her companion to wake up, at which point Lane again "announced 'sheriff's office'" and ordered defendant and her companion to go to the front door. They complied.

Hunter and Lane met defendant and her companion at the front of the house. Defendant's companion was arrested on a probation violation. Defendant told officers that she did not wish to speak to them. Lane was able to smell alcohol on her breath while he was speaking with her.

Hunter had requested that the day shift take over for the night shift when it came on at 6:00 a.m. Deputy Hagan clocked in on the day shift around 5:30 a.m., received that request, and went to defendant's house. Four officers, including Lane and Hunter, were there when Hagan arrived. Lane told Hagan that they were there to investigate a hit-and-run and that he wanted Hagan to talk to defendant to see if she was under the influence of intoxicants.

Hagan went to speak with defendant, who was standing by her truck with one of the other officers. It was about 5:45 a.m. at the time. When Hagan introduced himself to defendant, she stated that the cops had been "jerks." Hagan told defendant that he wanted to hear her side of the story, and he read her the *Miranda* warnings. Defendant said that she would speak to Hagan, but not to the other officers.

In response to Hagan's questions, defendant told Hagan that she had had a few drinks at a friend's house and then drove home. Defendant estimated that she had arrived home at 1:00 or 2:00 a.m. Because Hagan smelled alcohol coming from the area where defendant was standing, and because Hagan "didn't see anything spilled on her that would really account for that," he asked defendant to

do the field sobriety tests (FSTs). Defendant failed those tests.

While defendant was performing the FSTs, the owner of the car that defendant had hit arrived at defendant's house. The victim observed defendant and identified her. At that point, Hagan arrested defendant for hit-and-run and driving under the influence. Hagan then took defendant to jail, where she refused to submit to a breath test.

Defendant was charged by information with DUII, ORS 813.010, and failure to perform the duties of a driver, ORS 811.700. Before trial, defendant filed a motion to suppress "all evidence discovered pursuant to the unlawful search" of her property, "and the fruits thereof." In support of her motion, which relied on both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution, defendant argued that Lane's warrantless entry into her backyard was unlawful, and that the proper remedy for that violation was for the court to suppress all evidence resulting from the unlawful entry. Her theory was that all evidence discovered after Lane's unlawful entry into her backyard—beginning with Lane's observation of the odor of alcohol on defendant's person—was subject to suppression under the exploitation analysis of *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993), and *State v. Hall*, 339 Or 7, 115 P3d 908 (2005).[1]

The trial court granted the motion in part. It ruled that Lane's warrantless entry into defendant's backyard was an unlawful search, rejecting in the course of that ruling the state's argument that the search was justified by the emergency aid exception to the warrant requirement.[2]

---

[1] This case was tried (and briefed for appeal) before the Supreme Court's decisions in *State v. Unger*, 356 Or 59, 333 P3d 1009 (2014), and *State v. Musser*, 356 Or 148, 335 P3d 814 (2014). As a result, neither the trial court nor the parties had the benefit of those decisions when litigating the motion to suppress and therefore relied on the earlier decisions in *Hall* and *Rodriguez*. In *Unger* and *Musser*, the Supreme Court revised the analysis previously articulated in *Hall* and other prior cases; we therefore look to those decisions in resolving this appeal.

[2] The trial court concluded that it would not have been reasonable for officers to conclude that there was an immediate need for assistance for the protection of life or any other true emergency that would justify the entry into the backyard without a warrant. The court observed that there were no signs of injury or any other objective indications that someone's life was imperiled.

The court ruled further that, as a result of that unlawful search, suppression was required of all evidence obtained up to the point in time that Hagan contacted defendant. It reasoned that evidence stemming from Hagan's contact with defendant did not require suppression because Hagan had not been involved in the initial unlawful conduct, defendant voluntarily agreed to speak with Hagan, and defendant was not intimidated or coerced by Hagan. A jury subsequently convicted defendant of both charged offenses. Defendant appeals, challenging the trial court's denial of her motion to suppress.

## STANDARD OF REVIEW

We review the trial court's ruling on a motion to suppress to determine whether its findings of historical fact are supported by any evidence and "whether the trial court applied legal principles correctly to those facts." *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). To the extent that the trial court did not make explicit findings of historical fact regarding a pertinent issue, "we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion"—provided, of course, that the evidentiary record can support those presumed findings of fact. *Id.*

## ANALYSIS

On appeal, defendant argues that the trial court erred when it did not exclude all of the evidence discovered after Lane's unlawful conduct. Defendant argues that Lane's unlawful search led Lane to unlawfully seize defendant by ordering her out of the house. Defendant further argues that that unlawful seizure directly led to officers' observations that she smelled of alcohol, which, in turn, led to the DUII investigation of her. Defendant also points out that the unlawful seizure was temporally linked to Hagan's contact with her, in that it was ongoing at that time. Defendant argues that those facts preclude the conclusion that Hagan's investigation was so attenuated from Lane's unlawful conduct so as to allow for the admission into evidence of the fruits of Hagan's investigation of Lane.

In response, the state does not dispute that Lane violated defendant's right under Article I, section 9, "to be

secure in [her] person[], house[], papers and effects, against unreasonable search" when Lane entered defendant's backyard through a latched gate, and then looked in defendant's windows. The state also does not dispute that, by ordering defendant to her door, Lane unlawfully seized defendant, in violation of Article I, section 9.[3] The question before us, then, is whether the evidence obtained after the initial unlawful search must be suppressed under Oregon's Article I, section 9, exclusionary rule. Under that rule, "[w]henever the state has obtained evidence following the violation of a defendant's Article I, section 9, rights it is presumed that the evidence was tainted by the violation and must be suppressed." *State v. Miller*, 267 Or App 382, 398, 340 P3d 740 (2014). To avoid suppression, the state bears the burden of proving that the evidence at issue "'did not derive from the preceding illegality.'" *Id.* (quoting *Hall*, 339 Or at 25).

Here, the state argues that it met that burden by demonstrating that Hagan was not involved in the initial violation of defendant's rights, that Hagan provided defendant with *Miranda* warnings and told her that she could refuse to take the field sobriety tests, and that defendant voluntarily chose to speak with Hagan. The state also suggests that Hagan's investigation did not use "any information obtained from the unlawful entry." The state contends that those facts demonstrate that the evidence resulting from Hagan's contact with defendant was sufficiently attenuated from Lane's conduct so as to not be tainted by that conduct.

We disagree. Hagan's contact with defendant was the direct result of Lane's unlawful conduct, and was not attenuated from it. Lane's entry into defendant's gated backyard was just the first in a sequence of violations of defendant's Article I, section 9, rights. *See State v. Somfleth*, 168 Or App 414, 426-28, 8 P3d 221 (2000) (warrantless entry into gated backyard violated Article I, section 9, rights to be free from unreasonable searches). Lane followed up on that violation by peering into windows with a flashlight from his unlawful vantage point in the backyard, again in violation

---

[3] In particular, in response to defendant's argument that Lane's command to defendant to come to the front door was a seizure, the state does not dispute that that order effectively directed defendant and her companion to come out of their house.

of Article I, section 9. *See State v. Fortmeyer/Palmer*, 178 Or App 485, 491-99, 37 P3d 223 (2001) (officers violate Article I, section 9, by peering into windows when officers are doing so from an unlawful vantage point or in a manner that violates social and legal behavioral norms). And when that unlawful scrutiny led to the discovery of defendant, Lane followed up by ordering defendant to the front door of her house, again in violation of Article I, section 9. *See State v. Dahl*, 323 Or 199, 206-09, 915 P2d 979 (1996) (defendant was unlawfully "seized" when law-enforcement officials ordered him to come out of the house "with his hands up" because the police had neither a warrant nor probable cause and exigent circumstances); *see also State v. Fair*, 353 Or 588, 600, 302 P3d 417 (2013) (ordering a person out of her house is a seizure under Article I, section 9, that requires a warrant or an exception to the warrant requirement).

The net result of that chain of Article I, section 9, violations was that defendant was found by Lane, removed from the privacy of her home, and subjected to the scrutiny of Lane, Hagan, and other officers, as well as to the scrutiny of the victim. That scrutiny directly led to the victim's out-of-court identification of defendant at that time. That scrutiny also directly led to the investigation of defendant for driving under the influence of intoxicants. There is nothing in the record developed on the motion to suppress suggesting that, before Lane's unlawful seizure of defendant, defendant was suspected of driving under the influence of intoxicants. Rather, the DUII investigation began when Lane—who was able to observe defendant (and her breath) as a direct result of his unlawful seizure of her—smelled alcohol on defendant's breath, and directed Hagan to pursue that line of inquiry. As a result of Lane's direction and Hagan's own ability to smell alcohol on defendant (alcohol that Hagan could smell only by virtue of the fact that defendant had been removed from the privacy of her own home by Lane's unlawful seizure), Hagan asked for and obtained defendant's consent to perform the FSTs.

Under those circumstances, defendant's voluntary decision to speak to Hagan after receiving *Miranda* warnings, and defendant's voluntary consent to perform the field sobriety tests, did not break the connection between Lane's

conduct and the evidence obtained as a result of Hagan's contact with defendant. Whether a defendant's consent to a search, or consent to speak with officers,[4] breaks the connection between a prior illegality and subsequently discovered evidence depends on "the totality of the circumstances, including the temporal proximity between that misconduct and the consent, and the existence of any intervening or mitigating circumstances. We also consider the nature, purpose, and flagrancy of the misconduct." *State v. Unger*, 356 Or 59, 88, 333 P3d 1009 (2014).

Here, defendant's agreement to speak with Hagan, as well as her consent to perform the FSTs, was close in time to Lane's unlawful conduct—at most 15 to 20 minutes after Lane unlawfully searched defendant's backyard and windows and then initiated the unlawful seizure of defendant. As defendant points out (and the state does not dispute), that unlawful seizure of defendant was ongoing at the time that Hagan contacted defendant.

Additionally, Hagan's conduct "exploited" the earlier violations of defendant's rights under Article I, section 9. *State v. Musser*, 356 Or 148, 157, 335 P3d 814 (2014) (defining "exploitation" and its role in the determination whether the Article I, section 9, exclusionary rule requires the suppression of evidence). Hagan sought defendant's consent to perform the FSTs, as well as her voluntary statements, "solely as a result of knowledge of inculpatory evidence obtained from [Lane's] unlawful conduct." *Id.* Again, Lane's unlawful seizure of defendant removed her from the privacy of her house, resulting in both Lane and Hagan being able to observe the inculpatory smell of alcohol on defendant. Those observations led to Hagan's inquiry into whether defendant had been driving while intoxicated. That constitutes exploitation, as the Supreme Court has defined it. *Id.* at 158 (where "unlawful conduct led to the request for

---

[4] The state does not suggest that the analysis applicable to defendant's *Mirandized* statements differs from the analysis applicable to the evidence obtained as a result of defendant's consent to perform the FSTs. Accordingly, for purposes of this case, we apply the same framework to both types of evidence, without addressing whether there are circumstances in which *Mirandized* statements should be treated differently from physical evidence obtained in a consent search for purposes of our exclusionary rule analysis.

identification, which led to observation of pouches that the officer believed contained drugs, which led to the request to search and the evidence ultimately obtained" that evidence was a product of the initial unlawful conduct).

Finally, we note that the unlawful conduct at issue here was flagrant. It evidenced a disregard for well-established rules applicable to searches and seizures. It is well established that Article I, section 9, does not permit a police officer to enter a gated backyard, absent a warrant or an exception to the warrant requirement. *Somfleth*, 168 Or App at 425. It is well established that Article I, section 9, does not permit a police officer to look through a window, absent a warrant or an exception to the warrant requirement, when the officer does so from an unlawful vantage point. *Fortmeyer*, 178 Or App at 489, 491-92; *see State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995). It also is well established that Article I, section 9, does not permit a police officer to look through a window, absent a warrant or an exception to the warrant requirement, when the officer does so in a manner that is contrary to "social and legal norms of behavior" (by, for example, moving a curtain aside). *Fortmeyer*, 178 Or App at 491-92. And it is well established that Article I, section 9, does not permit a police officer to order a citizen from the privacy of a home, absent a warrant or an exception to the warrant requirement. *Fair*, 353 Or at 600-02; *Dahl*, 323 Or at 206-08. Lane's conduct also intruded on defendant's privacy in her own home, a setting in which the protections of Article I, section 9, are at their highest. *Fair*, 353 Or at 600-01.

Accordingly, we conclude that the trial court erred when it declined to suppress the evidence resulting from defendant's contact with Hagan.[5] That error was not harmless. It

---

[5] Defendant argues that she is entitled to suppression of five items of evidence: Hagan's observations of defendant; the victim's observations of defendant; statements that defendant made to Hagan; defendant's consent to, and performance on, FSTs; and defendant's refusal to submit to a breath test. The state does not argue that any of that evidence is admissible, in the event that we conclude that the trial court erred in determining that Hagan's contact with defendant was attenuated enough to break the causal link between the evidence and Lane's unlawful conduct. Absent a developed argument by the state as to why some of the evidence would nonetheless be admissible, we conclude that all of it must be suppressed.

was central to the state's case against defendant on the DUII charge. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (error is harmless only if there is "little likelihood that" the error affected the verdict).

We reach a different conclusion with respect to the conviction for failure to perform the duties of a driver. The only evidence pertaining to that conviction that resulted from Lane's unlawful conduct was the car owner's identification of defendant at her house on the night of the collision. However, defendant's identity was not in dispute at trial; whether she performed the duties of the driver was. In defendant's opening statement at trial, she acknowledged that she was the driver who had driven the truck into the parked car. Her defense to the charge that she failed to perform the duties of the driver was that she and the car owner were neighbors, and that they had agreed that she could run home to get the information that she needed to exchange with him. In addition, the state presented other evidence at trial that defendant was the driver, including the car owner's in-court identification of defendant,[6] as well as the evidence that the driver of the truck was a female, and that the truck involved in the collision was located in defendant's driveway minutes after the collision. Under those circumstances, there is little likelihood that the erroneous admission of the car owner's out-of-court identification of defendant affected the jury's verdict on the charge of failure to perform the duties of a driver.

Conviction for driving under the influence of intoxicants reversed and remanded; otherwise affirmed.

---

[6] Defendant argues that we should remand so that defendant can challenge the validity of the in-court identification under *State v. Lawson/James*, 352 Or 724, 291 P3d 673 (2012). However, defendant's motion to suppress did not specify that she was seeking to suppress any in-court identification. In addition, defendant never argued that the victim should be precluded from identifying defendant in court, or that any potential in-court identification should be excluded. Defendant thus did not put at issue the validity of the in-court identification. *Cf. State v. Crook*, 93 Or App 509, 512-13, 762 P2d 1062 (1988) (remanding for trial court to consider whether suppression of out-of-court identification also required suppression of in-court identification where defendant's motion to suppress had "requested suppression of any in-court identification"). For that reason we reject defendant's argument that we should remand to permit her to challenge the admissibility of the in-court identification.