Argued and submitted April 21, convictions on Counts 1 and 2 reversed and remanded, convictions on Counts 3 and 4 reversed October 14, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ANGELA DEE KELLY,
*Defendant-Appellant.*

Washington County Circuit Court
C120310CR; A153088

360 P3d 691

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the briefs were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

**HADLOCK, J.**

Defendant appeals a judgment of conviction for delivery of methamphetamine, ORS 475.890; possession of methamphetamine, ORS 475.894; and two counts of endangering the welfare of a minor, ORS 163.575. Defendant first assigns error to the trial court's denial of her motion to suppress evidence that deputy sheriffs discovered after one of the deputies conducted a warrantless search by opening defendant's garage door without first obtaining her consent. In her second and third assignments of error, defendant challenges the trial court's denial of her motion for judgment of acquittal on the charges of endangering the welfare of a minor, arguing that the state failed to prove that the minors were present when defendant was engaged in unlawful drug activity. We generally agree with each of defendant's challenges to the judgment of conviction. First, we conclude that the trial court erred when it denied defendant's motion for judgments of acquittal on the child-endangerment charges; we therefore reverse her convictions on Counts 3 and 4 of the indictment. Second, we conclude that the deputies' warrantless opening of defendant's garage door was not justified by probable cause; we further conclude that the deputies obtained the evidence at issue through exploitation of that unlawful search. Accordingly, we reverse and remand defendant's convictions for delivery and possession of methamphetamine (Counts 1 and 2).

We state the facts consistent with the trial court's explicit and implicit factual findings, which the record supports. *State v. Culley*, 198 Or App 366, 374, 108 P3d 1179 (2005) (citation omitted). At some point in her past, defendant used drugs, including methamphetamine. Perhaps for that reason, defendant had been assigned a caseworker, James, from the Department of Human Services (DHS), although defendant was already in recovery when James was assigned defendant's case. James had not seen defendant for about a year before the events at issue here, which occurred in February 2012, when defendant was living in a house with her two young children.

James testified that she decided to visit defendant's home because DHS "had received a couple of calls to our

hotline from different reporters regarding concerns based on [defendant's] behavior that she may be—that she allegedly was using drugs again." For reasons that do not appear on this record, James also had "concerns about the conditions of [defendant's] home." Accordingly, James, accompanied by Washington County deputy sheriffs Betonte and Wormington, went to defendant's home. When James and the deputies reached the house, they saw that the door of the attached garage was partly open, raised about eight to 18 inches from the ground. As James and the deputies stood outside the garage, they heard one male voice and one female voice, which James identified as defendant's, inside the garage. The deputies and James identified themselves and James said something about needing to speak to defendant because DHS had received calls. One of the deputies asked the people inside to open the garage. Defendant and the other person did not respond, but continued moving around inside the garage. After about 30 seconds, James and the deputies heard defendant say "hide that." Deputy Betonte promptly opened the garage door because he believed "that people are either hiding evidence, destroying evidence or getting weapons potentially ready harm the police or DHS." Betonte could then see inside the garage, but he remained outside.

One of the deputies asked defendant whether he, the other deputy, and James could enter the garage. James also told defendant that DHS "had a call of concern and [the caseworker] needed to speak with her about it." Defendant "was very cooperative" and told the deputies and James that they could come into the garage. James told defendant that she "needed to see the conditions of the home" and asked if she could go inside the residence. Defendant consented to that entry, too. While James and Wormington headed toward the door that separated the garage and the home, Betonte, who was still in the garage, saw a scale with white residue on it. Betonte remained in the garage with the man (McCord) who had been there with defendant. After some discussion with McCord, Betonte went into the house and asked defendant for permission to search the garage, which defendant provided. Upon searching the garage, Betonte found two small bags of methamphetamine, one of which was in the pocket of McCord's jacket, that he was not wearing at the time.

At some point, Wormington read defendant her *Miranda* rights. Defendant subsequently admitted that she had purchased the methamphetamine that morning, then sold half of it to McCord, conducting that transaction in the garage. Defendant also admitted the drug transaction to James, explaining that she and McCord had both planned to use the methamphetamine "once she sold it to him." Defendant told Wormington that she had smoked both marijuana and methamphetamine "the day before as well as that day." She also said that "she wanted to get the drugs out of the house prior to the kids coming home."

A subsequent search of defendant's bedroom also revealed evidence of defendant's drug use. Defendant's purse was there, and James asked defendant if she could look in the purse for drugs. Defendant consented, admitting that the purse held marijuana. James then asked defendant if any more drugs or paraphernalia were in the bedroom, and defendant acknowledged that a bong was underneath her bed. The children's bedroom was across the hall from defendant's. No drugs were found in that room. Overall, the house was appropriately clean.

At no point during the encounter did the deputies make threats or promises in order to gain defendant's consent to search. Nor did the deputies point their weapons at defendant or otherwise threaten her.

The state charged defendant with unlawful delivery of methamphetamine, unlawful possession of methamphetamine, and two counts of endangering the welfare of a minor. Defendant moved to suppress the evidence obtained after the deputy opened her garage door, arguing that that action constituted a warrantless search conducted in violation of both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. The trial court denied that motion, ruling that the deputies acted lawfully in opening the garage door as "a reasonable response to an exigent circumstance."

After the trial court denied defendant's suppression motion, the case went to trial before the court on the evidence that the state had offered in the suppression hearing.

After the state rested, defendant moved for a judgment of acquittal on the two counts of child endangerment on the ground that the state failed to prove all of the essential elements of the crime. Specifically, she argued that the state was required to, but did not, establish when the children would have been at the house, asserting that "the State at least has to have some evidence of when the children are around this." In response, the state pointed to James's testimony that the children lived at defendant's house, that their bedroom was across the hall from defendant's, and that defendant had talked about the children returning home. The trial court denied the motion for judgment of acquittal, ruling that "a reasonable trier of fact could infer that the kids were imminently going to be there." Defendant did not present any evidence, and the trial court convicted defendant of all the crimes charged.

We begin by addressing defendant's second and third assignments of error, in which she argues that the trial court erred when it denied her motion for judgments of acquittal. In Counts 3 and 4 of the indictment, the state charged defendant with two counts of violating ORS 163.575(1)(b) by, with respect to each of her two children, "unlawfully and knowingly permit[ting the child], a person under 18 years of age, to enter or remain in a place where unlawful activity involving controlled substances was maintained or conducted."[1] Defendant unsuccessfully moved for judgments of acquittal on those charges on the ground that her children were not at home when the deputies found drugs there and the record included no evidence about when the children might have been there.

On appeal, defendant again argues that, to establish a violation of ORS 163.575(1)(b), the state was required to prove "a concurrence in time of the child's presence in a place and the unlawful drug activity." Defendant asserts that the record in this case includes no such evidence; that is, she contends that the record includes no evidence from

---

[1] Those charges reflect the wording of ORS 163.575(1)(b), which provides that a person commits the offense of endangering the welfare of a minor if the person knowingly "[p]ermits a person under 18 years of age to enter or remain in a place where unlawful activity involving controlled substances is maintained or conducted."

which a factfinder could infer that the children were, in fact, at the home at a time when drugs were present. The state does not take issue with defendant's reading of ORS 163.575(1)(b). More significantly, for purposes of our analysis, the state implicitly acknowledges that it prosecuted this case solely on a theory that the children were in defendant's home while defendant was actively engaged in possessing, using, or selling drugs.[2] Nonetheless, the state argues, the trial court properly denied defendant's motion for judgment of acquittal because "the evidence was sufficient for a factfinder to reasonably infer defendant possessed, used or sold marijuana or methamphetamine when the children were in the home." The state focuses on defendant's admission that she had used drugs on the day of the search and on the previous day, that defendant had possessed and sold drugs in her attached garage, and that defendant had marijuana in a purse in her bedroom, along with a bong.

The question before us, then, is whether the record includes evidence that would allow a factfinder to determine, beyond a reasonable doubt, that defendant permitted her children to be in the home when unlawful drug activity was taking place. We conclude that it does not. We begin by observing that the record includes no evidence suggesting that the children were present at either time that defendant admittedly used drugs—once on the day that the deputies searched her home and once at some unspecified time on the day before that. Still, the state argues, a factfinder could infer that defendant possessed drugs in her home on an ongoing basis and that the children, therefore, must have been in the home at some point when drugs were there.

We are not persuaded. Although defendant admitted using marijuana and methamphetamine both on the day that the search occurred and on the previous day, no evidence supports a finding that she kept drugs in the house on an ongoing basis. To the contrary, defendant told James and

___

[2] Thus, this case does not require us to consider when, if ever, a defendant's unlawful drug activity in a particular place could endanger the defendant's children when they are in that same location, despite the defendant not being actively engaged in the illegal drug activity when the children are present.

the deputies that she had purchased methamphetamine on the morning that they searched her house, had sold half of it to McCord, had planned to smoke the methamphetamine with McCord (who was still at defendant's home when the search was conducted), and had wanted to rid the house of drugs before her children came home. Nothing in the record contradicts those statements, and we hesitate to hold that a person's admission that she used drugs on two consecutive days (and sold drugs on at least one of those days) is sufficient to establish beyond a reasonable doubt that she possessed drugs in her house at times in between. Nor are we inclined to conclude, as an abstract matter, that a person's possession of drug paraphernalia, which could confirm the person's *use* of drugs, always would support an inference beyond a reasonable doubt that the person possessed drugs in her home at times *other than* when she was using or about to use them.

We need not answer those precise questions, however, because the record in this case is deficient in another significant respect—it includes no evidence from which a factfinder could infer that the children were home on the evening before defendant's house was searched, that is, between the two times that defendant admittedly possessed marijuana and methamphetamine. Although defendant had custody of her children, who had a bedroom in her home, nothing in the record indicates why the young children were not home at the time of the search, whether they had been gone for only a short time or for a more extended period, or whether their absence might have begun the previous day or even earlier. Accordingly, the record includes no evidence from which a factfinder could infer that the children were in the house at any specific time that coincided with defendant's unlawful possession, use, or delivery of drugs.[3] Accordingly, the evidence does not support a determination that defendant violated ORS 163.575(1)(b) by "affirmatively making it possible for [her children] to enter or remain in

___

[3] As defendant points out, she could not properly have been convicted of having endangered her children's welfare on a theory that—had the deputies and James not interrupted her drug activity on the day of the search—the children *would have* returned home while that activity was ongoing. The state sensibly does not urge us to adopt such reasoning.

a place where unlawful drug activity [was] taking place." *State v. McBride*, 352 Or 159, 169, 281 P3d 605 (2012). The trial court erred when it denied defendant's motion for judgments of acquittal on the two counts of endangering the welfare of a minor.

We turn to defendant's first assignment of error, in which she challenges the denial of her suppression motion, citing both Article I, section 9, and the Fourth Amendment. Specifically, defendant contends that the state failed to prove either that the deputies had probable cause to believe that controlled substances were in the garage or that exigent circumstances justified a warrantless entry. Defendant also argues that the evidence was found through exploitation of that unlawful search. The state responds that the deputies had probable cause to believe that defendant was engaged in "unlawful drug activity" and that an exigency existed because defendant, who was aware that law enforcement officers wanted to talk to her, told her companion to "hide that." Moreover, the state contends that, even if the search was unlawful, defendant voluntarily consented to the searches that followed and her consent to the subsequent searches was not obtained through exploitation of any illegality. Therefore, the state concludes, the trial court ruled correctly when it denied the motion to suppress.

We begin by addressing defendant's argument that the deputy sheriff violated Article I, section 9, when he opened her garage door. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (courts address state constitutional issues before those under the federal constitution). In determining whether a warrantless search was constitutional, we are bound by the trial court's findings of fact that are supported by the record. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Whether those findings establish probable cause or exigent circumstances is a question of law, and this court reviews the denial of a motion to suppress for legal error. *State v. Woodall*, 181 Or App 213, 217, 45 P3d 484 (2002) (citation omitted). If the trial court did not make express findings on a disputed point of fact, we presume that the court implicitly found the facts consistent with the judgment it entered. *Ehly*, 317 Or at 75.

Article I, section 9, guarantees that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search[.]" Warrantless entries and searches of premises are *per se* unreasonable unless they fall within an exception to the warrant requirement. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). One such exception permits law enforcement officers to enter a home if they are "presented with both probable cause to believe that a crime had occurred and an exigent circumstance." *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991). The state bears the burden of proving that such an exception to the warrant requirement exists. *Id.*

"Under Article I, section 9, of the Oregon Constitution, probable cause exists only if the arresting officer subjectively believes that it is more likely than not that an offense has been committed and that belief is objectively reasonable." *State v. Williams*, 178 Or App 52, 60, 35 P3d 1088 (2001) (citation omitted). In determining whether objective probable cause exists, "we consider the totality of the circumstances presented to the officer and reasonable inferences that may be drawn from those circumstances; no single factor is dispositive." *State v. Miller*, 265 Or App 442, 446, 335 P3d 355 (2014) (citing *State v. Kappel*, 190 Or App 400, 404, 79 P3d 368 (2003)). Defendant does not contend that the officers in this case lacked subjective probable cause; rather, she argues only that the totality of the circumstances did not objectively establish that she probably had committed a crime.

We turn to that question. The state asserts that four factors contributed to the totality of the circumstances that gave the deputies probable cause to believe that defendant probably possessed drugs: (1) defendant's history of drug use, (2) the anonymous reports that defendant was acting in a manner consistent with renewed methamphetamine use, (3) defendant having said "hide that" after the caseworker and the deputies alerted her to their presence, and (4) the furtiveness of defendant's actions after she was alerted to the deputies' presence. After considering each of those factors, we ultimately conclude that, based on the totality of the

evidence, the deputies' subjective belief that defendant probably was engaged in criminal activity was not objectively reasonable.

Significantly, the record contains no evidence (other than the anonymous reports described below) that defendant had engaged in drug activity for at least a year before the searches at issue in this case. Although a past history of drug abuse can contribute to a finding of probable cause, we have explained that information about unlawful drug activity "is prone to staleness," but can be "refreshed" with more recent information that indicates current illegal activity. *State v. Chase*, 219 Or App 387, 393-94, 182 P3d 274 (2008). *See also State v. Young*, 108 Or App 196, 204, 816 P2d 612 (1991), *rev den*, 314 Or 392 (1992) (staleness is a "shorthand description of the analysis about whether or not the evidence sought will be there after the length of time since the event described in the affidavit occurred").

Here, evidence that defendant was in recovery for methamphetamine use was at least a year old by the time her garage was searched and, therefore, by itself provides little basis for concluding that defendant was engaged in illegal drug activity in February 2012. We therefore consider whether the other facts on which the state relies, to determine whether they support a conclusion that defendant probably had illegal drugs in her home at that time.

The state, like James, puts significant emphasis on the calls to DHS suggesting that defendant's recent behavior indicated that she had resumed using methamphetamine. As the state acknowledges, however, the record includes no evidence that the people who called DHS identified themselves or gave any information suggesting that they had first-hand knowledge that defendant was using drugs. Indeed, the record contains no indication, and the trial court made no findings, that the reports were based on personal observations. *See State v. Koroteev*, 222 Or App 596, 600, 194 P3d 842 (2008) ("The reasonableness of [the officer's] belief is diminished by the conclusory nature of the caller's description of defendant and his conduct. Neither the unidentified caller nor the persons who pointed toward defendant indicated how—or why—they apparently had

determined that he was committing a crime."). Moreover, the deputies were unable to make personal observations corroborating the report that defendant was using methamphetamine before they conducted the warrantless search. Those facts lead us to conclude that the reports did not have sufficient indicia of reliability to contribute meaningfully to a determination of probable cause. Even when we consider the less-demanding reasonable-suspicion standard, we give little weight to anonymous tips that do not reflect personal observation by the informant and that are not independently corroborated by a police officer's own observations. *See State v. Villegas–Varela*, 132 Or App 112, 115, 887 P2d 809 (1994) (describing three-factor test for determining whether an informant's report contains sufficient indicia of reliability to create reasonable suspicion); *cf. State v. Guggenmos*, 350 Or 243, 256, 253 P3d 1042 (2011) (observing that the reasonable suspicion standard "permits an invasion of privacy * * * on the basis of an informant's report that is different in quantity or content than probable cause might require").

Next, the state argues that an objective determination of probable cause is supported by the fact that defendant said "hide that" and moved furtively within the garage after James and the deputies alerted her to their presence. In conjunction with that argument, the state asserts that defendant would have "no reason to say 'hide that' if the item was not illegal." We disagree with the latter assertion. A person might wish to hide any number of personal effects from law enforcement officers; a person's desire to keep personal items private does not, by itself, indicate that those items are contraband. We also reject the state's more general argument that defendant's command to "hide that" and her furtive movements in the garage contribute significantly to a probable cause determination in this case. Certainly, a person's furtive gestures or attempts to conceal an item can, in conjunction with *other* indicia of criminal activity, support probable cause to believe that the person possesses contraband or other incriminating evidence. Our decision in *State v. Cole*, 87 Or App 93, 741 P2d 525, *rev den*, 304 Or 280 (1987), reflects that principle. In that case, two officers were patrolling a high-crime neighborhood known as "Cocaine Corridor." They observed the defendants sitting in a parked

car, with its lights off, using a flashlight to illuminate an activity occurring in the car. As the officers approached, one defendant hid a flat object, consistent with the smooth surfaces typically used to snort cocaine, under his seat. Based on their observations as well as their training and experience, the officers arrested the defendants. The trial court granted the defendants' motion to suppress on the ground that the officers lacked probable cause to effectuate the arrest. This court reversed, stating, "[the defendant's] attempt to conceal something quickly in apparent response to the presence of police *combined with the other factors,* gave [the police officer] an objective basis to believe it more likely than not that defendants were in possession of cocaine." *Id.* at 98 (emphasis added).

But furtiveness alone does not establish probable cause to believe that a person is committing a crime. *State v. Jacobs,* 187 Or App 330, 335, 67 P3d 408 (2003). In *State v. Scarborough,* 103 Or App 231, 796 P2d 394 (1990), for example, officers observed the defendant acting suspiciously outside a car. One of the officers asked if the defendant possessed identification and, as she dug through her purse, the officer shined a flashlight in the direction of her purse, and the defendant pulled it away. *Id.* at 233. On the basis of the defendant's attempt to hide her purse from view, the officer proceeded to search it. We held that the defendant's furtiveness was not sufficient to justify the officer's search:

> "[D]efendant's attempts to prevent the officers from looking into her purse do not support a finding of probable cause. Furtive movements may add to a finding of probable cause when they are contemporaneous with the officer's observations of other information consistent with criminal activity. Here, however, there was no other indication that a crime had occurred, and defendant's actions may not be used to establish probable cause."

*Id.* at 234-35 (citations omitted).

This case is closer to *Scarborough* than it is to *Cole.* As we explained above, the facts upon which the state relies, other than defendant's furtiveness, contribute little to a probable-cause determination. Under these circumstances, defendant's furtiveness—manifested both through

her physical movements and through her statement to "hide that"—was not sufficient to establish that she more likely than not was engaged in criminal activity when the deputy sheriffs opened her garage door. Considering the totality of the circumstances, the deputies' subjective belief that defendant probably possessed controlled substances in her garage was not objectively reasonable under the totality of the circumstances. Accordingly, the deputies violated Article I, section 9, when they opened defendant's garage door without first obtaining defendant's consent to that search.[4]

The remaining question is whether, as the state asserts, "suppression is unwarranted," despite the unlawful opening of defendant's garage door, "because the officers did not exploit any illegality" to obtain defendant's consent to the searches that revealed the evidence at issue. The state's argument implicates Oregon's rights-based exclusionary rule, which has the goal of restoring a defendant "to the same position as if the government's officers had stayed within the law by suppressing evidence obtained in violation of the defendant's rights." *State v. Unger*, 356 Or 59, 67, 333 P3d 1009 (2014) (internal quotation marks omitted). Under that rule, we presume that evidence discovered following an Article I, section 9, violation "was tainted by the violation and must be suppressed." *State v. Miller*, 267 Or App 382, 398, 340 P3d 740 (2014) (citation omitted). Thus, when a defendant seeks to suppress evidence that was discovered during a consent search that followed unlawful police conduct, "the state bears the burden of demonstrating that (1) the consent was voluntary; and (2) the voluntary consent was not the product of police exploitation of the illegal stop or search." *Unger*, 356 Or at 75. In the end, the question is "whether the consent was 'tainted' because it was 'derived from' or was a 'product of' the unlawful conduct." *Id.* at 80. "[W]here the taint is limited, the degree of attenuation necessary to purge the taint is correspondingly reduced." *Id.* at 81 (citation omitted). *See also State v. Kuschnick*, 269 Or App 198, 210, 344 P3d 480 (2015) (summarizing the *Unger* factors).

---

[4] Because we conclude that the deputies lacked probable cause, we need not address whether defendant's furtive movements and statement to "hide that" would have created an exigency had other circumstances established objective probable cause of criminal activity.

The exploitation or attenuation analysis, like a probable-cause determination, involves consideration of the "totality of the circumstances." *Id.* at 79-80. Factors important to that analysis include the temporal proximity of the unlawful police conduct and the defendant's consent, whether any intervening or mitigating circumstances exist (like officers having advised the defendant of the right to refuse consent), whether officers "traded on" information obtained during an illegal search or seizure in subsequently gaining consent to search further, the intrusiveness or severity of the police misconduct, whether the police misconduct was flagrant, and the nature of the police officers' purpose in engaging in the unlawful conduct. *Id.* at 80-83.

In this case, the deputies sought and obtained defendant's consent to search her garage, and then the house, promptly after they opened the garage door in violation of Article I, section 9. Moreover, the record includes no indication that the deputies advised defendant that she had a right to refuse their requests to search, and one deputy read defendant her *Miranda* rights only later. Accordingly, the "temporal proximity" and "intervening or mitigating circumstances" factors weigh in defendant's favor, that is, in favor of a determination that the police misconduct tainted defendant's subsequent consents to search. *See State v. Benning*, 273 Or App 183, 197, 359 P3d 357 (2015) (in the absence of an "extended temporal break," the "temporal proximity" consideration weighed against a finding of attenuation); *id.* at 199 (discussing lack of mitigating circumstances, like the defendant having been told that he was free to leave).

Other factors favor the state. Once the deputies had opened the garage door, they did not engage in threatening or overbearing behavior. They did not point weapons at defendant or McCord, they made no promises or threats in order to gain consent, and they did not immediately see drugs, paraphernalia, or other items within the garage that prompted their first request for defendant's consent to search. Thus, the deputies did not directly trade on information gained as a result of the unlawful opening of the garage door to obtain defendant's consent.

The deciding factors in this case, however, are the intrusiveness, purpose, and flagrancy of the unlawful search that Betonte conducted when he opened defendant's garage door. That act was highly intrusive. It revealed the interior of the garage attached to defendant's house—a space that the deputies knew that defendant was attempting to keep private, as she declined to respond to their calls from outside. Betonte's purpose in opening the garage door appears to have been investigative—he wished to prevent defendant from attempting to conceal or destroy evidence—and, given the statements that the deputies and James made before the garage door was opened, defendant would have been aware of that apparent purpose.[5] *See Unger*, 356 Or at 90 (it is not officers' "subjective intent or motivations" that matter, but their statements and "the undisputed facts surrounding" their contact with the defendant). Moreover, the unlawful act was flagrant—Betonte opened a door to reveal the interior of a private space closely associated with defendant's residence, without a search warrant and under circumstances that (at least as described in this record) clearly did not establish a basis for conducting a warrantless search. *Cf. State v. Sanchez*, 273 Or App 778, 787, 359 P3d 563 (2015) (concluding that officers' unlawful conduct was flagrant when it violated "well-established rules applicable to searches and seizures").

That flagrantly intrusive conduct put defendant in a disadvantaged position; that is, the unlawful conduct was "more likely to influence improperly * * * defendant's consent to search," *Unger*, 356 Or at 81, as compared to less severe Article I, section 9, violations, such as an officer's act of knocking on a back door instead of a front door (as in *Unger*, 356 Or at 91-92), or reaching through the front door of a residence, without stepping inside, to knock on an interior door with the goal of checking on the occupant's safety (as in *State v. Lorenzo*, 356 Or 134, 145-46, 335 P3d 821 (2014)). In combination with the temporal proximity of the unlawful search and the deputies' request for defendant's consent

---

[5] Although Betonte also testified that defendant could have been readying weapons, the record includes no evidence suggesting that defendant had a history of violence or of unlawful weapons possession, and the state does not seek to justify the search on officer-safety grounds.

to search, as well as the lack of intervening or mitigating circumstances, we conclude that the state did not meet its burden to prove that defendant's "consent was independent of, or only tenuously related to, the illegal police conduct." *Unger*, 356 Or at 84. The trial court therefore erred when it denied defendant's motion to suppress the evidence found as a result of her consents to search.

Convictions on Counts 1 and 2 reversed and remanded; convictions on Counts 3 and 4 reversed.