Argued and submitted November 19, 2020; convictions on Counts 1, 2, and 3 reversed and remanded, remanded for resentencing, otherwise affirmed November 24, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JASON BENJAMIN MADDEN,
*Defendant-Appellant.*

Lane County Circuit Court
201305158; A170903

502 P3d 746

Defendant assigns error to the trial court's denial of his motion to suppress evidence that he contends was discovered after he was unlawfully seized in violation of Article I, section 9, of the Oregon Constitution. Officers handcuffed defendant when they encountered him outside of a house that was the subject of a search warrant. The officers brought defendant inside while they secured the house. After securing the house, the officers continued to detain him and interviewed him in a private room. Defendant argues that his continued detention after the house was secured was an arrest made without probable cause. The state argues that defendant was not arrested, but merely stopped, and that the stop was supported by reasonable suspicion. *Held*: Defendant was arrested without probable cause when the officers continued to detain him in handcuffs and interviewed him after officer safety concerns dissipated.

Convictions on Counts 1, 2, and 3 reversed and remanded; remanded for resentencing; otherwise affirmed.

Lauren S. Holland, Judge.

Zachary Lovett Mazer, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jonathan N. Schildt, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Adam Holbrook, Assistant Attorney General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Convictions on Counts 1, 2, and 3 reversed and remanded; remanded for resentencing; otherwise affirmed.

**SHORR, J.**

Defendant appeals for the second time, assigning error to the trial court's denial of his motion to suppress evidence that he contends was discovered after he was unlawfully seized in violation of Article I, section 9, of the Oregon Constitution. Police officers detained defendant when they discovered him sitting in a car in the driveway of a house that was the subject of a search warrant. The officers handcuffed defendant and his passenger, brought them inside, and questioned defendant after the house was secured. Over the course of two interviews, defendant made incriminating statements and gave his consent to search the car, which led to the officers' discovery of the evidence at issue. In the first appeal, the Supreme Court concluded that the initial seizure and transportation of defendant into the house were justified for officer safety reasons, but defendant's continued detention after the house was secured was not similarly justified. The court remanded the case to the trial court to determine whether that later police conduct was instead justified by reasonable suspicion that defendant had committed a crime. *State v. Madden*, 363 Or 703, 705, 427 P3d 157 (2018). On remand, the trial court concluded that the officers had reasonable suspicion and that defendant's continued seizure after officer safety concerns dissipated was constitutional. Defendant appealed. For the reasons below, we agree with defendant that he was unlawfully seized. Consequently, we reverse and remand Counts 1, 2, and 3; we also remand for resentencing.

We review a trial court's denial of a motion to suppress evidence for legal error. We are bound by the trial court's findings of fact if there is constitutionally sufficient evidence to support them. To the extent that the trial court did not make express findings of fact, we presume the court found facts consistent with its ultimate conclusion. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017). No new evidence was presented on remand; the trial court expressly referenced, the Supreme Court's recitation of the facts, indicating that it found the facts as summarized in that recitation. Accordingly, we restate the Supreme Court's description of the historical facts, and discuss additional relevant facts below.

"In January 2013, detectives with the Springfield Police Department obtained a warrant to search the residence of Sheehan, a 'known user and dealer of methamphetamine,' for evidence of delivery of controlled substances. The search warrant authorized the police to search Sheehan's person and residence. It did not refer to any other person or location.

"Late in the morning of January 30, 2013, the detectives and other members of the Springfield Police Department— eight in total—parked their cars down the street from Sheehan's house and proceeded to the house on foot, intending to execute the warrant. As they approached the house, they saw two men—defendant and Lando—sitting in a car parked in the driveway. Three of the officers— Detectives Potter, Hargis, and Espinosa—immediately recognized Lando, who was sitting in the front passenger's seat with the door slightly ajar, as a person whom they had arrested on multiple occasions for drug crimes. None of the officers recognized the man sitting in the driver's seat, *i.e.*, defendant.

"Detectives Potter and Hargis quickly moved toward the car to 'contact' defendant and Lando. Before Potter reached the car, he saw defendant reach back and shove a bag down between the seats. Potter removed defendant from the car, directed him to keep his hands raised, and handcuffed him, while Hargis did the same with Lando. Both men were subjected to pat-down searches, during which Hargis pulled two baggies, one of which appeared to contain methamphetamine, from Lando's pocket. All of this occurred very quickly, and defendant and Lando were taken into the house as the officers entered it to execute the search warrant a few minutes later.

"After securing the house, most of the other officers became engaged in the search, while Potter assembled defendant, Lando, and the house's two occupants in the living room. Potter then administered *Miranda* warnings to them and proceeded to take them, one at a time, into a separate room to question them. Defendant was the first person who was questioned in that manner: Potter had separated him from the others and commenced to question him within five to 10 minutes of entering the house. During that initial questioning, Potter asked defendant about the car and whether it contained anything that was illegal. Defendant responded that the car belonged to a friend, and

eventually acknowledged that it contained methamphetamine and a gun. Potter asked if defendant would consent to a search of the car, but defendant seemed reluctant. Potter then told defendant to 'think about it' while he questioned Lando and the others. Later, when Potter questioned defendant a second time, defendant agreed to the search and signed a form that stated that he was consenting to the search freely and voluntarily and that he understood that he could refuse to give consent. In the search of the car that followed, the police found a large amount of methamphetamine, a handgun, and other incriminating items inside the bag that Potter had seen defendant push between the seats. Defendant was charged with unlawful possession and delivery of methamphetamine and, based on his status as a felon, unlawful possession of a firearm."

*Madden*, 363 Or at 706-07 (footnotes omitted).[1]

At the original motion to suppress hearing, Potter described his knowledge of the house where he encountered defendant. He testified that the department had received reports of drug deals at the house through an anonymous tip line. Potter also worked with an informant who confirmed that methamphetamine was sold at the house and who described the house as a "flophouse" where people were "constantly coming and going." Potter testified that drug transactions took place both inside and outside the house.

In addition to his specific knowledge of the house, Potter described his extensive training and experience with drug crime investigations. According to Potter, drug deals often happened in cars and Potter had personally seen over one hundred drug transactions occur between people in cars. Potter was also aware, based on his training and experience, that drugs are transported from Mexico to Oregon through California and he observed that defendant's car had California license plates.

The trial court denied the motion to suppress, deciding that the seizure of defendant was lawful for officer safety reasons. The trial court declined to address the state's other argument, that the stop was justified by reasonable

---

[1] The state does not contend that defendant's later consent to the search of his car was attenuated from the officer's prior stop or seizure such that the search was independently justified by that consent.

suspicion. *Id*. at 710. On review, the Supreme Court agreed that officer safety concerns justified *some* of the officers' actions, but not all. Specifically, the court concluded that directing defendant to exit the vehicle, patting him down, handcuffing him and bringing him into the residence were all reasonable safety precautions to minimize the risk in entering and securing the house. *Id*. at 721. But, the court explained, "there was no reasonable officer safety justification for continuing to detain him, in handcuffs, *Mirandizing* him, repeatedly transporting him alone into another room, and repeatedly questioning him" once the house was secured. *Id*. at 722. Those later actions "ultimately produced the evidence at issue." *Id*. at 723. Therefore, because that conduct was not justified by the officer safety doctrine, the court remanded the case to the trial court to "reach the reasonable suspicion argument it did not address." *Id*. at 726.

On remand, the state argued that Potter and the officers' detention of defendant after securing the house was a lawful stop justified by reasonable suspicion. The state argued that defendant's presence at a high-traffic, known drug house, his association with a known drug dealer, his California license plates, and his attempt to hide his backpack were all facts that supported Potter's reasonable suspicion that defendant was engaged in criminal activity. Defendant contested the state's reasonable suspicion theory. In addition, defendant responded that the seizure was not a stop, but an arrest. And, defendant argued, that arrest was not supported by probable cause based on the circumstances known to the officers.[2] The trial court rejected defendant's arguments. It decided that defendant was stopped, not arrested, and that the stop was justified by reasonable suspicion. After a stipulated-facts trial and conviction, defendant appeals for the second time, assigning error to the trial court's denial of his motion to suppress. The parties raise substantially the same arguments on appeal. Because the requisite level of constitutional justification depends on the type of seizure, we begin by determining whether defendant was arrested or merely stopped.

---

[2] The state initially contended that defendant's probable cause argument was outside the scope of the remand, but later withdrew that argument.

Article I, section 9, guarantees the right against unreasonable searches and seizures. Only some police-citizen encounters are protected under that provision. "At one end of the continuum are mere encounters for which no justification is required," and at the other end lie arrests "which involve protracted custodial restraint and require probable cause." *State v. Fair*, 353 Or 588, 593, 302 P3d 417 (2013). In between are "temporary detentions for investigatory purposes," or stops, which "require reasonable suspicion." *Id*. Arrests and stops are seizures that implicate the protections of Article I, section 9, whereas mere encounters are not. *Id*. at 593-94. When a defendant moves to suppress evidence discovered because of a seizure, the state bears the burden of proving that the defendant was lawfully seized. *State v. Blackstone*, 289 Or App 421, 430, 410 P3d 354 (2017).

The distinction between stops and arrests is sometimes a murky one, but generally speaking, arrests and stops differ in the scope, duration, and degree of the restraint. *Fair*, 353 Or at 593 (describing stops as "temporary detentions for investigatory purposes" and arrests as seizures involving "protracted custodial restraint"); ORS 133.005(1) (defining an arrest as "to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging that person with an offense").

During stops, officers may detain suspects for a reasonable time to investigate a crime. ORS 131.615. Officers may also use the degree of force reasonably necessary to make the stop and ensure the safety of the officer and others present. *State v. Sepulveda*, 288 Or App 632, 640, 406 P3d 169 (2017). However, "the duration of the detention or intensity of the officer's actions can convert a stop into an arrest under Article I, section 9." *State v. Medinger*, 235 Or App 88, 93, 230 P3d 76 (2010). And "a restraint that goes beyond the scope of a stop will result in an illegal arrest, if it is not based on probable cause." *State v. Morgan*, 106 Or App 138, 141, 806 P2d 713, *rev den*, 312 Or 235 (1991). Handcuffing a suspect is generally, though not always, a restraint that exceeds the scope of a stop. *State v. Werowinski*, 179 Or App 522, 528, 40 P3d 545, *rev den*, 334 Or 632 (2002). "An officer confronted with safety concerns may handcuff a person without converting the stop into an arrest, but the stop is

Cite as 315 Or App 787 (2021)                                    793

converted into an arrest if the officer continues to use force to restrain the person after the officer's safety concerns have dissipated." *State v. Hebrard*, 244 Or App 593, 598, 260 P3d 759 (2011). To determine whether a "stop escalated to an arrest, we make 'a fact-specific inquiry into the totality of the circumstances of the particular case.'" *Id*. (quoting *State v. Ehly*, 317 Or 66, 78, 854 P2d 421 (1993)).

As an initial matter, although it is clear from the record and the Supreme Court's opinion that defendant was handcuffed for some period of time after the house was secured, the parties disagree about the precise length of time. Potter testified that he could not remember exactly when defendant's handcuffs were removed. He recalled that defendant "was sitting there [in the living room] handcuffed" until the first interview, which was five to 10 minutes after the officers entered the house, and that defendant was no longer handcuffed by the second interview. The trial court did not make an express finding on the issue. The state urges us to conclude that the court impliedly found that the handcuffs were removed at the outset of the first interview. Defendant counters that that finding is not supported by the record or a necessary predicate to the court's ultimate conclusion. Nonetheless, defendant contends that, under the totality of the circumstances, defendant was arrested, even if the handcuffs were removed at the outset of the first interview as the state insists. We agree. As we explain below, the circumstances were sufficiently coercive that defendant's detention rose to the level of an arrest.

Accepting, without deciding, that defendant's handcuffs were removed at the beginning of the first interview, defendant was restrained in handcuffs for at least several minutes after officer safety concerns dissipated. That physical restraint weighs in favor of the conclusion that defendant was arrested when considered with other circumstances here, even if it was not unduly long. *Sepulveda* is illustrative. In that case, officers encountered the defendant near a reported disturbance. Believing that the defendant was reaching for a weapon, the officers drew their firearms and ordered the defendant to raise his hands in the air and get on his knees. The officers then handcuffed the defendant and frisked him but did not find any weapons. After

the frisk, the officers did not remove the defendant's handcuffs. Instead, they advised the defendant of his *Miranda* rights and then obtained his consent to search his pockets. *Sepulveda*, 288 Or App at 633-34. We described the events in that case as a "brief encounter." *Id*. at 638. Nonetheless, we concluded that the defendant was arrested when the officers continued to use force to detain him after the frisk revealed that the defendant did not have a weapon. *Id*. at 640-41.

Here, like *Sepulveda* where the restraint was not lengthy, other circumstances also weigh in favor of our conclusion. While handcuffed, officers *Mirandized* defendant and the others and read the search warrant to them. Eight officers were present in the house, searching for evidence of drug crimes. Potter then separated defendant from the others and took him to the interview room, where Potter questioned him about his relationship to the homeowner, his reason for being in the driveway, and whether he had drugs and weapons in his car. A reasonable person would understand from that series of events that he was at a minimum not free to go and was enmeshed in the execution of the warrant. Those circumstances, in combination with the actual restraint of the handcuffs, affected the scope and intensity of the investigation such that it became an arrest.

The state offers *State v. Bush*, 203 Or App 605, 126 P3d 705 (2006), and *State v. Cottrell*, 215 Or App 276, 168 P3d 1200, *rev den*, 343 Or 554 (2007), in support of its contention that defendant was not arrested here. In *Bush*, officers responded to a call complaining that the defendant would not leave the caller's front porch. The officers approached the defendant and told him to stand in the driveway away from the front door. One of the officers spoke with the defendant in the driveway but did not handcuff him or confine him in their patrol car. *Bush*, 203 Or App at 607. We held that "the police officers' conduct was fully consistent with a routine and lawful stop." *Id*. at 609. We likewise concluded that the defendant was not arrested in *Cottrell*. 215 Or App at 282. There, an officer approached the defendant, asked him to step out of his car, and then questioned a convenience store clerk while the defendant waited outside with a second officer. *Id*. at 278-79. The officer did not use any restraints or confine the defendant in the back of his patrol car. *Id*. at 282.

The state's attempt to analogize those cases to this one is not persuasive, given the differences in the scope, duration, and degree of the restraint here.

One particular difference is that, unlike the present case, neither of the defendants in *Bush* or *Cottrell* were ever handcuffed, which the state does not meaningfully contend with. Instead, the state suggests that defendant was handcuffed so briefly after the house was secured that it should not factor in our analysis. But defendant *was* handcuffed after safety concerns dissipated, and, although the decision was initially justified by officer safety concerns, that heightened degree of restraint bears weight in our analysis. *Werowinski*, 179 Or App at 528 ("handcuffing a suspect may be a key factor in transforming the detention associated with a stop into an arrest"). We do not suggest that failure to remove a suspect's handcuffs immediately after officer safety concerns dissipate will always amount to an arrest. Whether and under what conditions an officer removes a suspect's handcuffs is one factor to be considered in context with all of the circumstances of a defendant's seizure. We only conclude that, under the totality of the circumstances here, defendant's detention exceeded the scope of a stop.

Because defendant was arrested, the state bore the burden of proving that probable cause existed to justify the arrest. Under Article I, section 9, "probable cause exists only if the arresting officer subjectively believes that it is more likely than not that an offense has been committed and that belief is objectively reasonable." *State v. Williams*, 178 Or App 52, 60, 35 P3d 1088 (2001). In determining whether objective probable cause exists, we consider "the totality of the circumstances presented to the officer and the reasonable inferences that may be drawn from those circumstances." *State v. Sinkey*, 303 Or App 673, 677, 465 P3d 284 (2020).

Here, the state contends that the following circumstances, considered in combination, support a determination that Potter had probable cause to believe defendant "had engaged in illegal drug activity." First, defendant was sitting in a car that was parked in a driveway of a house known for frequent drug activity and was the subject of a targeted investigation. Potter was aware that drug sales occurred

inside and outside of the house. Second, Potter knew from previous interactions that defendant's passenger Lando was a drug dealer and user and Potter found methamphetamine in Lando's pocket. Third, Potter saw defendant shoving his backpack between the seats, as he approached, which Potter viewed as an attempt to conceal the backpack from the police. Finally, Potter had significant training and experience with drug transactions and had witnessed over 100 drug sales in cars.

We disagree with the state's view of the circumstances here. The facts known to Potter, viewed individually or collectively, were not sufficient to establish a reasonable basis to believe that, more likely than not, defendant committed a drug crime. To begin with, Potter's only observation which related specifically to defendant's behavior, was of defendant's act of shoving his backpack between the seats. Even assuming defendant saw Potter approach the car, that observation, without more, would not support an objectively reasonable inference that defendant had engaged in drug activity. Because "[a] person might wish to hide any number of personal effects from law enforcement officers" for innocent reasons, "a person's desire to keep personal items private does not, by itself, indicate that those items are contraband." *State v. Kelly*, 274 Or App 363, 374, 360 P3d 691 (2015).

And apart from his observation of the backpack, the facts supporting Potter's belief that defendant committed a crime were not specific to defendant and related instead to defendant's proximity to drug use by others. *State v. Sunderman*, 304 Or App 329, 347-48, 467 P3d 52 (2020) (officer's belief that the defendant probably possessed methamphetamine was not objectively reasonable where "the only specific and articulable fact particularized" to the defendant was the defendant's possession of two unused methamphetamine pipes). Thus, although one potential explanation for defendant's presence at the house and association with Lando is that defendant had, or was about to buy or sell drugs, the facts known to Potter did not support a conclusion that that criminal explanation was more likely than other noncriminal explanations. *State v. Barraza*, 206 Or App 505, 510, 136 P3d 1126 (2006) ("Although the presence

of an innocent explanation does not necessarily dispel probable cause, the incriminating explanation must be the more likely one when all of the facts are considered."). Because the totality of the circumstances here fail to demonstrate a probability that defendant was engaged in illegal drug activity, we conclude that probable cause did not exist to arrest defendant.

In sum, we conclude that defendant was unlawfully arrested when he was detained after officer safety concerns dissipated. Further, probable cause did not exist to justify the arrest. The evidence at issue was discovered as a result of defendant's unlawful arrest and must be suppressed. Lastly, we conclude that the trial court's erroneous admission of that evidence was not harmless as to Counts 1 through 3 of the indictment.[3]

Convictions on Counts 1, 2, and 3 reversed and remanded; remanded for resentencing; otherwise affirmed.

---

[3] Defendant was convicted of unlawful delivery of methamphetamine (Count 1), unlawful possession of methamphetamine (Count 2), possession of a firearm as a felon (Count 3), and unlawful possession of methamphetamine (Count 4). The evidence that gave rise to the convictions in Counts 1 through 3 was the subject of the motion to suppress. The evidence relating to Count 4 related to a separate incident that was not litigated in the motion to suppress.